STATE of Wisconsin, Plaintiff-Respondent,

v.

Steiney J. RICHARDS, Defendant-Appellant-Petitioner.

Supreme Court

*No. 93–0391–CR. Oral argument April 3, 1996.—Decided June 12, 1996.*

(Also reported in 549 N.W.2d 218.)

For the defendant-appellant-petitioner there were briefs and oral argument by *David R. Karpe*, Madison.

For the plaintiff-respondent the cause was argued by *Stephen W. Kleinmaier*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

WILLIAM A. BABLITCH, J.   Steiney J. Richards (Richards) seeks review of a decision of the court of appeals affirming his conviction for possession of cocaine base with the intent to deliver. Richards argues that because the police failed to "knock and announce" prior to entering his motel room to execute a search warrant, any evidence seized must be suppressed. The issue is simply stated: whether the Fourth Amendment allows a blanket exception to the general requirement of "knock and announce" (the rule of announcement) for entries into premises pursuant to a search warrant for evidence of felonious drug delivery. We conclude that exigent circumstances are always present in the execution of search warrants involving felonious drug delivery: an extremely high risk of serious if not deadly injury to the police as well as the potential for the disposal of drugs by the occupants prior to entry by the

847

police.[1] The public interests inherent in these circumstances far outweigh the minimal privacy interests of the occupants of the dwelling for which a search warrant has already been issued. Accordingly, we re-affirm *State v. Stevens*, 181 Wis. 2d 410, 511 N.W.2d 591 (1994), *cert. denied*, 115 S. Ct. 2245 (1995), and conclude that police are not required to adhere to the rule of announcement when executing a search warrant involving felonious drug delivery.[2]

As a prefatory note, we took this case to examine the continuing validity of *Stevens* in light of the recently decided U.S. Supreme Court case of *Wilson v. Arkansas*, 115 S. Ct. 1914 (1995). We conclude that *Stevens* remains valid. In *Stevens*, this court adopted a blanket exception to the rule of announcement in cases involving a search warrant for felonious drug delivery. *Wilson*, decided subsequently to *Stevens*, held that the rule of announcement forms part of the Fourth Amendment reasonableness inquiry. The Court in *Wilson* left

[1] The concurrence's position would, in many instances, place the police in situations of great personal risk. It makes neither good law nor good sense. Despite the overwhelming evidence across the country of the inherent dangerousness of these situations, the concurrence would deny the police the right to forego "knock and announce" unless the police had specific information about the dangerousness of the drug house to be searched and specific information about the dangerousness posed by its occupants. Thus, in those cases in which such specific information is unavailable, the concurrence would force the police into the untenable position of subjecting themselves to extremely high risks detailed in this opinion. We decline to follow the concurrence's invitation.

[2] We use the phrase "felonious drug delivery" to mean felonious delivery of drugs or felonious possession with intent to deliver drugs in violation of Subchapter IV, Wis. Stat. §§ 161.41, 161.42 and 161.43.

it to the lower courts to determine the circumstances under which an unannounced entry is reasonable under the Fourth Amendment. We proceed to do so now.

The dispositive facts for purposes of this appeal can be stated succinctly: on December 31, 1991, police executed a search warrant for the motel room of the defendant seeking evidence of the felonious crime of Possession with Intent to Deliver a Controlled Substance in violation of Wis. Stat. § 161.41(1m)(1991-92).[3] They did not knock and announce prior to their entry. Drugs were seized.

The circuit court denied Richards' motion to suppress. Richards subsequently entered pleas of no contest to the felony of possession of cocaine base with the intent to deliver, Wis. Stat. § 161.41(1m), and a tax stamp violation, Wis. Stat. § 139.95(2).[4] The court found him guilty and sentenced him to 13 years imprisonment on the possession with intent count and three years concurrent imprisonment on the tax stamp count. Richards appealed. The court of appeals upheld the circuit court's ruling, relying on *Stevens*. Richards filed a petition for review which we granted.

---

[3] All future statutory references will be to the 1991-92 volume unless otherwise indicated. Wis. Stat. § 161.41(1m) provides in relevant part:

    **(1m)**    Except as authorized by this chapter, it is unlawful for ny person to possess, with intent to manufacture or deliver, a controlled substance.

[4] Wisconsin Stat. § 139.95(2) states, in relevant part:

    **(2)**    A dealer who possesses a schedule I controlled substance or schedule II controlled substance that does not bear evidence that the tax under s. 139.88 has been paid may be fined not more than $10,000 or imprisoned for not more than 5 years or both.

■ The sole issue before this court is whether the Fourth Amendment to the United States Constitution[5] allows a blanket exception to the general requirement of "knock and announce" for entries into premises pursuant to a search warrant for evidence of felonious drug delivery. This is a question of law that we review without deference to the lower courts. *State v. Betterley*, 191 Wis. 2d 406, 416-17, 529 N.W. 2d 216 (1995).

Richards summarizes the issue in one sentence: "The blanket 'drug house' exception to the 'knock and announce' rule violates the Fourth Amendment's reasonableness requirement." Richards contends that the U.S. Supreme Court decision in *Wilson* forbids blanket rules regarding search and seizure because the reasonableness of each search must be examined on a case-by-case basis. The State of Wisconsin (State) argues that *Wilson* does not forbid blanket rules and, under *Wilson*, the blanket rule announced in *Stevens* is still valid. We agree with the State.

The Fourth Amendment to the United States Constitution and Wisconsin Constitution art. I, § 11 protect the security of people "in their persons, houses, papers, and effects against unreasonable searches and seizures." While this court may interpret Wis. Const. art. I, § 11 more strictly than the United States Supreme Court interprets the Fourth Amendment, it has consistently and routinely conformed the law of

---

[5] Amendment IV of the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

search and seizure under the Wisconsin Constitution to the law developed by the United States Supreme Court under the Fourth Amendment. *State v. Williams*, 168 Wis. 2d 970, 981, 485 N.W. 2d 42 (1992); *see State v. Guzman*, 166 Wis. 2d 577, 586-87, 480 N.W.2d 446 (1992).

The Fourth Amendment proscription against unreasonable searches and seizures not only requires that there be probable cause to undertake the search or make the seizure but also that the search or seizure be conducted in a reasonable manner. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). The rule of announcement, which requires police officers seeking to enter a dwelling in the execution of a search warrant to announce their identity and allow time for the door to be opened voluntarily, addresses the manner in which a legitimate governmental intrusion is to take place. *Williams*, 168 Wis. 2d at 981. The rule of announcement has a common law heritage and serves three primary justifications: (1) protecting the individual's privacy in the home; (2) decreasing the potential for violence by alerting the resident that the officer is legitimately on the premises; and (3) preventing the physical destruction of property by giving the resident the opportunity to admit the officer voluntarily. *Id.* at 981-82. Under certain circumstances, a search is reasonable under the Fourth Amendment even if the police dispense with the rule of announcement and execute a no-knock entry. *Wilson*, 115 S. Ct. at 1918-19; *see also Stevens*, 181 Wis. 2d at 423. The knock and announce rule may be excused if "exigent circumstances" exist to justify the no-knock entry. *United States v. Singer*, 943 F.2d 758, 762 (7th Cir. 1991). Exigent circumstances " 'include a reasonable belief

851

that announcement of police presence would endanger the safety of the police or others, or a reasonable belief that unannounced entry is required to prevent the destruction of evidence.' " *Williams*, 168 Wis. 2d at 982 (citations omitted).

These "exigent circumstances" formed the basis of our decision in *State v. Stevens*. In *Stevens* , we held that when the police have a search warrant, supported by probable cause, to search a residence for evidence of delivery of drugs or evidence of possession with intent to deliver drugs, they necessarily have reasonable cause to believe exigent circumstances exist. *Stevens* , 181 Wis. 2d at 424-25. We reasoned that the rationale behind the rule of announcement was no longer valid in today's drug culture. "In fact, by announcing their presence, police may actually increase the likelihood for violence." *Id.* at 428. When the police execute a search warrant for evidence of drug delivery, there is reasonable cause to believe both that drugs will be destroyed and evidence lost, and that the occupants of the residence will be armed. *Id.* at 432. Therefore, a no-knock search is reasonable any time the police have a warrant, supported by probable cause, to search a residence for "evidence of drug dealing." *Id.* The limited privacy interests of the individual were balanced against two other governmental interests: the public's substantial interest in stopping or at least curtailing the drug trade and its related crimes, and the police officers' interest in protecting themselves and others from harm. *Id.* This court concluded:

> When the police execute a search warrant for evidence of delivery of drugs or evidence of possession with intent to deliver, there is reasonable cause to

believe both that the drugs will be destroyed and evidence lost and that the occupants of the residence will be armed . . . Even when the police dispense with the entire knock and announcement, the societal interest in stopping the drug trade, combined with the police officers' safety interest, outweigh the occupants' limited privacy interests.

*Stevens*, 181 Wis. 2d at 432.

Richards contends that the practical effect of *Stevens* is a flat rule which cannot be valid given the level of intrusion and the fact that too much discretion is allowed to police officers. Richards argues that the blanket exception to the knock and announce rule is inconsistent with the U.S. Supreme Court's decision in *Wilson*.

In *Wilson*, the defendant challenged a police entry into her home pursuant to a search warrant authorizing a search for evidence of drugs and drug paraphernalia. The defendant's suppression motion alleged that the police violated the common law principle requiring them to knock and announce their presence and authority before entering. The U.S. Supreme Court held that whether the officers knock and announce their presence and authority before entering a dwelling as required by the common law "forms a part of the Fourth Amendment reasonableness inquiry." *Id.* at 1916. The Court, however, noted that not all unannounced entries are unreasonable. "[L]aw enforcement interests may also establish the reasonableness of an unannounced entry." *Id.* at 1919. The Court stated:

This is not to say, of course, that every entry must be preceded by an announcement. The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of

announcement that ignores countervailing law enforcement interests. As even petitioner concedes, the common-law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances.

*Id.* at 1918. The Court recognized that under certain circumstances, the presumption in favor of announcement necessarily gives way to contrary considerations. These contrary considerations include the threat of physical harm to the police, the pursuit of a recently escaped arrestee, or the belief that evidence will likely be destroyed. *Id.* The Court stated:

> We need not attempt a comprehensive catalog of the relevant countervailing factors here. For now, we leave to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment.

*Id.* at 1919.

Richards argues that the blanket "drug house" exception to the knock and announce rule adopted by this court in *Stevens* is no longer viable in light of *Wilson* . Richards further contends that *Wilson* requires a reasonableness analysis to be performed for every unannounced search and seizure. We disagree.

■■

In *Stevens*, this court did not announce a blanket rule doing away with the common law rule of announcement. Instead, we adopted a narrow exception to the general rule: when police have a search warrant to search a premises for evidence of felonious drug delivery, they do not have to knock and announce. When police have probable cause to support a search warrant for evidence of felonious drug delivery, the potential for dangerousness to the police and the poten-

tial for the destructibility of evidence is so great as to overcome the general rule. The very facts supporting probable cause to believe that drugs and drug dealers are present in a dwelling also lead to the reasonable belief that exigent circumstances exist. In sum, we conclude that exigent circumstances are always present when a search warrant for evidence of felonious drug delivery is executed.[6]

*Wilson* does not forbid blanket rules; rather, it requires such rules to be supported by the standard of "reasonableness." The Court left it to the lower courts to determine "the circumstances under which an unannounced entry is reasonable under the Fourth Amendment." *Wilson*, 115 S. Ct. at 1919.

---

[6] The State's brief argues extensively concerning the "level of justification" the Fourth Amendment requires before the police can legally make an unannounced entry to execute a search warrant for evidence of drug dealing. The State argues that the proper level of justification for a no-knock entry is a reasonable suspicion that an announcement would endanger the safety of the officers and/or occupants, or a reasonable suspicion that an announcement would result in the destruction of evidence.

We need not address what level of justification is necessary in this case. Here, we are dealing with the particular circumstances of a search warrant for evidence of felonious drug delivery. Our holding is based on the assumption that drug dealers will have weapons and pose a danger to officers, and that drug dealers will destroy evidence or at least attempt to destroy evidence after announcement by the police. Therefore, because exigent circumstances are always present, we do not address the issue concerning what level of justification is needed for a no-knock entry. This issue must be left to a case in which drugs are not involved.

The reasonableness of a search generally turns on whether it was conducted pursuant to a valid warrant. *U.S. v. U.S. District Court*, 407 U.S. 297, 309-10, 314-15 (1972). In deciding whether a particular police practice is reasonable, the Court has repeatedly said that the importance of the public interests must be weighed against the nature of the intrusion upon Fourth Amendment rights. *Maryland v. Buie*, 494 U.S. 325, 332 (1990). The Court stated that the balancing of these competing interests is " 'the key principle of the Fourth Amendment.' " *Gardner*, 471 U.S. at 8 (citation omitted).

We balance these competing interests by looking first to the public interests involved when police execute a search warrant for felonious drug delivery. Law enforcement officers have a substantial interest in being able to secure the site so that it may be searched promptly, efficiently and safely. The success of police in searching for evidence and instrumentalities of drug dealing depends on their ability to establish command of the scene quickly and to secure the safety of themselves, the occupants and the place to be searched. Note, D. Allegro, *Police Tactics, Drug Trafficking, and Gang Violence: Why the No-Knock Warrant Is an Idea Whose Time Has Come*, 64 Notre Dame L. Rev. 552, 553 (1989) [hereinafter Allegro].

Police officers face an unquantifiable risk of violence every time they go into a house to execute a search warrant.[7] The Court has recognized the unique danger police officers face in suspects' houses because the officers are coming onto their adversaries' "turf"

---

[7] The following represents only some of the recent newspaper articles documenting the escalating violence police face each day:

which has a configuration unknown to the officers. In *Maryland v. Buie*, 494 U.S. 325 (1990), the Court acknowledged that:

> A man was killed, and a Columbus police officer was slightly wounded last night during a drug raid. It was the second time this year that officers have been wounded in Near East Side Raids.

Erin Marie Medick, *Man Slain, Swat Officer Wounded Shootings Came in Near East Side Raid*, The Columbus Dispatch, Mar. 15, 1996.

> Designed to serve search warrants on crack houses, the Columbus Police Division's investigative and tactical unit is trained to enter homes where the risk of retaliation and gunfire is high. . . . The shooting occurred after police announced - as required by law - that they would be coming into the house, said Lt. William McKendry of the division's narcotics squad.

Alice Thomas, *Drug Raids Becoming Riskier For Police*, The Columbus Dispatch, Jan. 19, 1996.

> Interviews with police officers and a ballistics study will be used to determine who shot an Omaha police officer when police burst into a home to make an arrest Tuesday night, police said.

Angie Brunkow, *Origin of Shot That Hit Officer Sought*, The Omaha World-Herald, Mar. 1996.

> Police raided what they said was a family-run drug house early Saturday morning and then went into the drug business for a few hours. . . . Police confiscated 105 bags of heroin worth $2,600, about $5,000 worth of crack cocaine and six guns.

Karen Henderson, *Raid-Sting at Drug House Leads to 10 Arrests*, The Plain Dealer, Feb. 12, 1996.

> At least seven kinds of illegal drugs worth about $50,000, four guns and $36,500 in cash were seized by police when they raided a Spring Township house Wednesday morning, according to officials. . . . "This is the kind of thing we're used to finding, this and a lot more," he said, gesturing to an illegal sawed-off 12-gauge shotgun and a TEC-DC9 9mm semiautomatic pistol with a 30-bullet clip.

Steven Reinbrecht, *Police Raid Spring Twp. House, Confiscate Drugs, Guns and Cash*, Reading Eagle, Reading Times, Feb. 15, 1996.

> The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or road-side investigatory encounter. . . [A]n in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

*Id.* at 333.

As one commentator notes, the risk that police must face is greatly increased by a knock and announce requirement:

> [A] police officer making a high-risk warrant entry is at a severe disadvantage. When he announces authority and purpose he makes himself readily identifiable. The suspect, concealed inside a house, will generally be able to see the officer, or know where the officer is since he is most often near the door. Even if the officer can see occupants inside the house, he does not know if they intend to resist unless they are naive enough to reveal their violent intentions. The officers are most vulnerable when entering the house. If the announcement has given the [suspect] time to arm himself, all he needs to do is aim his firearm at the door and wait for a target to appear.

---

A SWAT team leading a force of more than 100 officers Wednesday raided an apartment building that police said had been turned into a fortress by drug dealers. . . . "There were armed guards at all entrances to the building, armed internal patrols 24 hours a day. All the key players were in constant contact with each other with hand-held radios." . . . That drug dealers could control an entire building in a city like Racine shows that "the drug thing is all over the place," Higgins said. "It doesn't matter how big the city is. This is like a nest."

Ann Bothwell, *SWAT Force Raids Racine Drug House*, The Milwaukee Journal, Jan. 29, 1992.

Allegro, at 566 (footnotes omitted).

These risks are only heightened when drugs are involved.[8] The connection between drugs and weapons has been well documented by appellate courts. *Michigan v. Summers*, 452 U.S. 692, 702 (1981); *Stevens*, 181 Wis. 2d at 420, 428-29; *Williams*, 168 Wis. 2d at 984-85; *United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994) ("[T]he law has uniformly recognized that substantial dealers in narcotics possess firearms and that entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers."); and *State v. Harris*, 384 S.E. 2d 50, 53 (N.C. App. 1989). The connection between drugs and weapons establishes that it is more than a possibility that guns will be found at the location that is the subject of a search warrant for drug dealing. Reporting on a study which concluded that drug dealers and gang members are the criminals most likely to use guns, an article in the New York Times noted:

> It is drug dealers, rather than drug users, who use guns, Professor Decker said, because they are usually carrying valuable quantities of drugs and large amounts of money and need the protection of a gun more than ordinary users.

---

[8] Statistics indicate that drug related violence is a growing contributor to police mortality. From 1977 to 1986, of the police officers murdered, 6.5 percent, or 57 of 875, were killed in situations involving drug matters. In 1985, 7.6 percent of police murders were drug related, and in 1986, 10.6 percent of police murders involved drug matters. Federal Bureau of Investigation, Crime in the United States: Uniform Crime Reports (statistics extracted from annual reports from 1977-1986). *See* Allegro at 570, n.32.

Fox Butterfield, *Study Discounts the Role of Drug Users in Gun-Related Crime*, N.Y. Times, Oct. 8, 1995, at 36.

The study revealed that, among arrestees who admitted selling illegal drugs in the past year, 25 percent reported they carried a gun all or most of the time. *Arrestees and Guns: Monitoring the Illegal Firearms Market*, National Institute of Justice, Research Preview, September 1995. The results of this study show that the likelihood of finding guns during the execution of a search warrant for drug dealing is "more than a possibility." The 25 percent figure in the study relates only to arrestees; and among arrestees it reflects only the admitted use of guns. The use of guns by all drugs dealers is certainly higher than the use reflected in that study. Nevertheless, even using the 25 percent figure in the study, "requiring police to knock and announce their identity before executing all search warrants for drug dealing would be tantamount to requiring the police before each warrant execution to play Russian roulette with a four-chamber gun." (Respondent's brief at 23).

When suspects resist the police with firearms, officers face serious disadvantages.[9] Allegro, at 554.

---

[9] Firearms claimed the lives of 92 percent of the officers killed in the line of duty from 1977 through 1986. Seventy percent of the murders were committed by the use of handguns, 13 percent by rifles, and 9 percent by shotguns. U.S. Department of Justice, Federal Bureau of Investigation, Uniform Crime Reports, Law Enforcement Officers Killed and Assaulted 4 (1986).

Nationwide, an average of 17 of every 100 law enforcement officers were assaulted in 1986, an increase of 7 percent from 1985. During the year, 64,259 line-of-duty assaults were reported by 9,755 law enforcement agencies covering approxi-

They are easily identified by spoken commands and uniform, while assailants may be difficult or impossible for the officers to see. *Id.* An assailant may determine when and where to shoot, and if he has time to prepare to resist, it takes him only half a second to fire an accurate shot from a cocked gun. *Id.* The police officer must evaluate whether the situation justifies use of deadly force, typically requiring evaluation of a series of factors, and if his or her gun is holstered, it takes him or her one to 1.2 seconds to draw and return fire. *Id.* at 554-55.

When an officer confronts a suspect who has a firearm in hand, in 40 percent of the cases the suspect will fire, will usually fire first, and will often shoot with a ballistically superior weapon. R.J. Adams & T.M. McTernan, *Street Survival: Tactics for Armed Encounters* 35 (1980). Police shootings almost invariably occur at close range and are over almost instantly.[10] Allegro, at 555.

> In the vast majority of cases, the officer is ten feet or less from the assailant. Normally, the initial exchange of gunfire is determinative, with most confrontations over in two to three seconds with no

mately 81 percent of the total United States population. These agencies employed a total of 380,249 officers. *Id.* at 41. Nearly 22,000 law enforcement officers were reported to have received personal injuries resulting from their assaults. *Id.*

[10] In almost half of the cases, the officer is five feet or less away. Of the more than 250 police officer murders in New York City from 1854 to 1980, the assailant was more than 20 feet away when he fired in only one case. *See* S. Chapman, *Cops, Killers and Staying Alive: The Murder of Police Officers in America* 21 (1986) (noting that from 1972-1984, 52.4 percent of officers murdered were zero to five feet from their assailants and 20.6 percent were six to ten feet away).

more than a total of three shots fired. Almost half the time, an officer will face multiple assailants. While the assailants will fire without regard to bystanders, the officer must accommodate their presence.

*Id.* at 555 (footnotes omitted).

In *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981), the Court recognized that the "risk of harm to both the police and the occupants [of an area subject to a search] is minimized if the officers routinely exercise unquestioned command of the situation." The sooner the officers have complete control of the situation, the less likely it is that any confrontation between suspects and officers will escalate to the point of gunfire. Minimizing this risk, in turn, ensures the safety not only of the officers, but also of suspects and of innocent bystanders.

All of this points to the need for officers to control the scene immediately, not only for their own safety and the safety of others, but also to seize evidence of felonious drug delivery. After all, a search warrant commands officers to go to a particular place to seize evidence of drugs and drug paraphernalia. In *Stevens*, we recognized that the "easily disposable nature of narcotics provides police with evidence sufficient to form a reasonable belief that no-knock entry is necessary to prevent the destruction of evidence." *Stevens*, 181 Wis. 2d at 425. If officers must knock and announce their authority and presence, they provide the occupants of the house with the opportunity not only to arm themselves, but to dispose of the evidence involving drugs.

Allowing police to take command of the situation is thus vital to the safe and effective execution of a search warrant for evidence of felonious drug delivery. Moreover, the officers executing a search warrant are in the

best position to decide how to take command of the situation. In some cases, police officers will undoubtedly decide that their safety, the safety of others, and the effective execution of the warrant dictate that they knock and announce; in other cases, they might decide that such a procedure would be counterproductive or even dangerous. "In cases like this, where the police have a valid warrant, supported by probable cause, to search a home for 'evidence of drug dealing,' the officers executing the warrant have the incentive to choose the safest method of entry." *Stevens*, 181 Wis. 2d at 430. It is constitutionally reasonable to allow officers in the field to decide what course of action to pursue instead of requiring them to "take unnecessary risks. . . ." *Terry v. Ohio*, 392 U.S. 1, 23-24 (1968); *see also Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (stating that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are often tense, uncertain, and rapidly evolving. . . .").

We now weigh these public interests of dangerousness and disposability against the individual's interest in having notice that a search warrant is about to be executed in a few short seconds. Richards argues that he has privacy interests in keeping the police outside of his dwelling until the police "knock and announce." Although we acknowledge that privacy interests in the home are fundamental, we also conclude that these interests are not sufficient to elevate Richards' privacy interests over the public's interest in having police officers safely and effectively execute a search warrant for evidence of felonious drug delivery.

Richards' privacy interests are only slightly advanced by a knock and announce rule. Although Richards correctly notes that people normally have the

highest expectation of privacy in their homes, this argument is largely irrelevant in this case. There is no dispute that within a matter of seconds after the police arrived with a search warrant, they were entitled to enter Richards' dwelling, with or without permission, and conduct as thorough a search as was reasonably necessary. The search had been authorized by a neutral magistrate, and would have occurred regardless of whether the police knocked and announced their presence.

> It is difficult to see, however, what actual protection is given to any right of privacy by the announcement rule. Once identity and purpose are stated, entry must always be permitted; if permission is denied, or even delayed for an inordinate amount of time, entry may be forced, provided the officer has a valid purpose in gaining admission. Since no discretion is vested in the occupant, in what manner does notice protect his privacy? . . .
>
> Thus balanced, the protections to privacy seem to be somewhat tenuous when compared to the potential for public harm. This is particularly true with respect to potential destruction of evidence, especially when one considers that the probable cause requirement would have to be met in any event.

Sonnenreich and Ebner, *No-Knock and Nonsense, An Alleged Constitutional Problem*, 44 St. John's L. Rev. 626, 647 (1970).

Here, the disruption of privacy interests is almost entirely attributable to the valid warrant, not the unannounced entry. "[W]here the police have a warrant to search the property, the residents retain only a very limited interest in privacy." *Stevens*, 181 Wis. 2d at 432. In *Stevens*, we stated that:

Even under the rule of announcement, after the police have announced their identity and purpose, the occupants must let them in within a reasonable time or the police may force their way in. The occupants' privacy interests are limited to knowing the police are entering and perhaps effecting the method of entry. The occupants do not have the right to refuse entry.

*Id.*

When we compare these limited privacy interests to the substantial interest the public has in allowing the police to safely and effectively execute a search warrant, the balance overwhelmingly favors the public interest.

Police have widely regarded narcotics enforcement as a particularly dangerous area of police work for some time. However, beginning in the early 1980's, the hazards to police officers escalated. Street gangs, spawned by decay in America's cities, and already known for their propensity for irrational violence, entered the drug business on a major scale.[11] In the

---

[11] Street gangs have been documented in cities in the United States throughout most of the country's history, but accounts by the media, practitioners, and some researchers suggest that gangs are now posing a more serious crime problem than in the past. U.S. Department of Justice, National Institute of Justice, *Street Gangs: Current Knowledge and Strategies* 1 (1993). And while reports conflict about the extent to which gangs play an organized role in drug trafficking, recent research suggests that gang members are highly visible in the drug trade. *Id.*

In addition, it is easy for gang members to obtain weapons.

It's real easy (for teenagers to get guns). You just have to have the money, and know somebody who can get one. Most gang members have . . . it's probably related to a drug dealer. They contact the drug dealer and tell him, "I pay so much for a gun." He'll say "OK,

1960's and 1970's, the police confronted and adjusted to a higher level of violence.

■

When the risks of law enforcement change radically, the rules by which courts regulate the police should reflect those changes. Therefore, we conclude that exigent circumstances are always present in the execution of search warrants involving felonious drug delivery. The public interests in these circumstances far outweigh the minimal privacy interests of the occupants of the dwelling for which a search warrant has already been issued. Accordingly, we re-affirm *Stevens* and conclude that police are not required to adhere to the rule of announcement when executing a search warrant involving felonious drug delivery. The decision of the court of appeals is affirmed.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (*concurring* ). On the basis of the facts found by the circuit court I conclude, as does the majority, that the entry executed against the defendant was reasonable under the Fourth Amendment. I write separately because I conclude that the majority's reaffirmation of the blanket exception to the knock-and-announce rule first decreed

---

I'll sell it to you." A .12 gauge sawed-off would run, like, about 50 to 90 bucks. Nobody really ever buys a gun over 50 unless its a fully-automatic. . . . One of the main interests when someone (a gang member) breaks into a house [is] to look for guns or money. Really the guns they want to look for.

Catherine H. Conly, *Hearing Summary of the National Field Study on Gangs and Gang Violence in Dallas, Texas*, Revised Draft Report (Washington D.C.: National Institute of Justice, December 1991), at 13.

in *State v. Stevens*, 181 Wis. 2d 410, 511 N.W.2d 591 (1994), *cert. denied*, 115 S. Ct. 2245 (1995),[1] fails to satisfy the Fourth Amendment's reasonableness requirement delineated by the United States Supreme Court in *Wilson v. Arkansas*, 115 S. Ct. 1914, 1918 (1995).

*Wilson* made clear that there is a "presumption in favor of announcement," 115 S. Ct. at 1918, but that the "Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." 115 S. Ct. at 1918. Law enforcement interests—including the threat of physical harm to law enforcement officers or the existence of reason to believe that evidence would likely be destroyed if advance notice were given—may establish the reasonableness of an unannounced entry. *Id.* at 1919.[2] The burden is on the prosecution to show exigent circumstances excusing the no-knock entry. *Id.*

By reaffirming *Stevens* and declaring that neither findings of fact nor a determination of reasonableness

---

[1] In *Stevens* , the court examined the facts of the case and concluded that they provided a reasonable basis for the law enforcement officers' unannounced entry. The *Stevens* court then proceeded to create a blanket rule that law enforcement officers need never comply with the knock-and-announce rule when the police have probable cause through a search warrant for evidence of delivery of drugs or evidence of possession of drugs with intent to deliver. *Stevens*, 181 Wis. 2d at 435. The holding in *Stevens* jettisoned longstanding Wisconsin case law interpreting and applying the knock-and-announce rule.

[2] The Court held "that although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry." *State v. Wilson*, 115 S. Ct. 1914, 1919 (1995).

are necessary in any case involving a search warrant of the premises of a drug dealer, today's majority opinion ignores the Court's instructions in *Wilson*. The majority also ignores the Court's "long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application" because "each case is to be decided on its own facts and circumstances." *Ornelas v. United States*, No. 95-5257, WL 276414 1996 at \*5 (U.S. May 28, 1996) (quoting *Ker v. California*, 374 U.S. 23, 33 (1963)). Moreover, and also in contradiction to what *Wilson* teaches, the majority opinion's reasoning logically leads to the complete abandonment of the knock-and-announce rule in every case involving the execution of a search warrant.

## I.

The blanket exception embraced by the majority today cannot be squared with the *Wilson* decision. Under *Wilson*, the courts rather than law enforcement officers are charged with determining whether the facts and circumstances of a particular search comply with the Fourth Amendment's command that such a search be reasonable. *Wilson*, 115 S. Ct. at 1919.

The action taken by the Arkansas high court after the *Wilson* case was remanded from the United States Supreme Court provides an illustrative contrast with the action taken by the majority today. The Arkansas Supreme Court summarily remanded to the trial court even though the facts in *Wilson* provided significantly stronger grounds than are present in this case for recognizing an exigent circumstances exception to the knock-and-announce rule. In *Wilson*, evidence that the accused was a drug dealer included an actual purchase of drugs made by a police informant. Further, the

accused had brandished a semi-automatic weapon while threatening to kill an informant if she worked for the police, while the accused's housemate had previously been convicted of arson and firebombing.

The Arkansas Supreme Court's reluctance to draw legal conclusions prior to the trial court's initial determination of whether a no-knock entry at issue was reasonable—despite strong evidence indicating that it was—contrasts sharply with this court's sweeping conclusion that *all* no-knock entries in cases involving drug dealers are, *ipso facto*, reasonable. Instead of "mak[ing] any necessary findings of fact and . . . mak[ing] the determination of reasonableness" which *Wilson* requires,[3] the majority instead concludes that

---

[3] Prior to executing the search warrant against the defendant in this case, the police knew that the defendant had previously been arrested for the possession of 63 packets of cocaine. Furthermore, after the defendant had checked out of another hotel, the police had found clear plastic sandwich bags like the ones used in packaging cocaine. Finally, information obtained from an informant demonstrated that the defendant and his companions had engaged in conduct that matched a drug courier profile, including paying in cash, refusing room service, and making and receiving numerous phone calls from their room.

While the circuit court found that these facts were sufficient to establish probable cause for a search warrant, it found them insufficient to justify a no-knock warrant and therefore rejected the request for a no-knock warrant.

When the police proceeded to execute the warrant, additional circumstances came into play. When the police first sought entry through a ruse, with one officer posing as a maintenance man, the defendant opened the door and then rapidly shut it again. The state and the defendant dispute whether the defendant recognized that the "maintenance man" was a police officer, as well as whether he saw the fully uniformed police

under current social conditions exigent circumstances are always present in the execution of search warrants involving felonious drug delivery.[4]

Had either the United States Supreme Court in *Wilson* or the Arkansas Supreme Court upon remand subscribed to a version of the blanket exception announced by the majority today, they need not have remanded for findings of fact and a determination of reasonableness, because there was no question but that the accused in *Wilson* was dealing drugs, owned a gun, and had threatened to use it. Both courts, how-

---

officer standing to the right of the "maintenance man." The circuit court characterized the defendant's testimony as self-serving and apparently accepted the officers' statement of what had happened.

Under these circumstances, compliance with the knock-and-announce-rule would constitute a "useless gesture." It has long been recognized "that notice is not required when it is evident from the circumstances that the authority and purpose of the police is already known to those within the premises." 2 Wayne R. LaFave, *Search and Seizure* § 4.8(f), at 620 (3d ed. 1996) (collecting cases); *see also State v. Berry*, 174 Wis. 2d 28, 32, 496 N.W.2d 746 (Ct. App. 1993) (when law enforcement officers hold a "reasonable belief that compliance with the rule" of announcement "would be a useless gesture," they need not comply with it).

[4] The majority might more appropriately have heeded Justice Scalia's recent reminder that the purpose of the Fourth Amendment requirement of reasonableness "is to preserve that degree of respect for the privacy of persons and the inviolability of their property that existed when the provision was adopted—even if a later, less virtuous age should become accustomed to considering all sorts of intrusion 'reasonable.'" *Minnesota v. Dickerson*, 508 U.S. 366 (1993) (Scalia, J., concurring).

870

ever, declined the opportunity to announce a blanket rule such as the rule embraced today by the majority.[5]

Hence it is not surprising that federal and state courts (in addition to the Arkansas Supreme Court) which have had occasion to interpret and apply *Wilson* have also conducted fact-specific, case-by-case analyses in determining whether no-knock entries made in executing drug-related warrants had met the Fourth Amendment's requirement of reasonableness.[6] The

---

[5] According to the accused's reply brief in *Wilson* filed with the United States Supreme Court by the defendant, the state and all of the amici supporting the state's position sought a blanket rule exempting drug searches from the reach of the knock-and-announce rule. Reply Brief for Petitioner, *Wilson v. Arkansas*, No. 94-5707, 1995 WL 120155, at *11 (U.S. Mar. 17, 1955).

[6] *See, e.g., United States v. Murphy*, 69 F.3d 237, 242-43 (8th Cir. 1995), *cert. denied*, 116 S. Ct. 1032 (1996) (no-knock entry to execute search warrant on drug manufacturer's premises reasonable under *Wilson* ; no-knock entries are reasonable when "particular facts regarding the premises to be searched" and "circumstances surrounding the execution of the warrant" establish exigent circumstances; police informed that accused sometimes carried a weapon, that weapons were on premises, that accused had a violent past and that accused was on parole from a second-degree murder conviction); *State v. Wilson*, 899 F. Supp. 521, 529 (Kan. 1995) (no-knock entry to execute search warrant for crack cocaine upheld; determination of reasonableness required by *Wilson* requires that "officers had particular reasons to believe that exigent circumstances existed"; "reasonableness inquiry focuses on what particular facts regarding the premises" were known to officers at the time); *State v. Moore*, 535 N.W.2d 417 (Neb. Ct. App. 1995) (no-knock entry to execute search warrant on drug dealer's premises unreasonable under *Wilson* ; given amount of marijuana to be seized, police believed it would be difficult to destroy it quickly; no evidence that the suspect was armed or dangerous); *State v. Vargas*, 910 P.2d 950

---

majority opinion cites no cases—and I have found none—supporting its interpretation of *Wilson*.

Finally, the majority cites no United States Supreme Court case eliminating the requirement that

(N.M. Ct. App. 1995) (no-knock entry to execute arrest warrant against drug traffickers was reasonable; while fact that defendants were suspected of trafficking in drugs and of possessing weapons was not itself enough to excuse compliance with rule of announcement, review of the record revealed additional evidence of defendants' violent tendencies and thereby established reasonableness of a no-knock entry); *State v. Ordonez-Villanueva*, 908 P.2d 333 (Or. Ct. App. 1995) (no-knock entry to execute search warrant for controlled substances reasonable under *Wilson*; informant had previously seen controlled substances which might be easily destroyed if police complied with the knock-and-announce rule); *State v. Mastracchio*, 672 A.2d 438, 443 (R.I. 1996) (question of whether no knock entry to execute search warrant on drug dealer's premises was reasonable remanded to circuit court; although state alleged that no-knock entry was justified to preserve officers' safety and prevent destruction of evidence, circuit court had not made the requisite factual findings and determination of reasonableness); *Hargrave v. Commonwealth*, 464 S.E.2d 176, 179 (Va. Ct. App. 1995) (no-knock entry to execute search warrant for drugs unreasonable under *Wilson*; although the object of the search was drugs, police did not have particularized suspicion that evidence could or would be readily destroyed).

*See also United States v. Jewell*, 60 F.3d 20, 23-24 (1st Cir. 1995) (*Wilson* requires a determination of whether an affidavit presented in support of an application for a no-knock warrant describes circumstances establishing that a no-knock entry would be reasonable); *United States v. Conley*, 911 F. Supp. 169, 172 (W.D. Pa. 1995) ("based on the teachings in *Wilson*, the Court believes that the circumstances of each factual situation should be considered by the Court in determining whether the unannounced entry is unreasonable under the Fourth Amendment").

872

officers be able to point to specific, articulable and individualized facts justifying their actions in each case. None of the cases cited by the majority relieves the state in Fourth Amendment cases from the requirement that officers' actions in a particular case be subject to meaningful judicial review to determine whether their actions are "objectively reasonable." *See, e.g., Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981); *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). While I recognize that "[t]he calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments," *Graham* , 490 U.S. at 397, it nevertheless is crucial that those judgments be assessed according to an "objective standard" by a detached and neutral judge. *Terry*, 392 U.S. at 21-22.

In allowing law enforcement officers rather than the courts to make the ultimate determination of whether a particular search has been conducted reasonably, the majority has ignored the United States Supreme Court's admonition that "[t]he scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge *who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances*." *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (emphasis added).

## II.

The majority opinion characterizes its blanket exception as "a narrow exception to the general rule" requiring a knock-and-announce entry. Majority op. at 848. The majority's reasoning, however, leads inexora-

873

bly to the conclusion that the police need never knock and announce and that their decision is not reviewable. As a result, the exception the majority opinion sets forth swallows the rule of announcement.

According to the majority, "[p]olice officers face an unquantifiable risk of violence every time they go into a house to execute a search warrant." Majority op. at 850. I agree with this assessment. Forty-two percent of America's 96.4 million households have some kind of firearms. Twenty-four percent of the households have pistols, 27% have shotguns and 23% have rifles.[7] The federal Bureau of Alcohol, Tobacco and Firearms estimates that there are approximately 200 million firearms in the nation, about one per person.[8] As the majority opinion points out, firearms claimed the lives of 92% of the law enforcement officers killed in the line of duty between 1977 and 1986.

According to the reasoning of the majority, then, the large number of firearms in this country and the large percentage of deaths of officers caused by firearms would create a compelling need to eliminate the knock-and-announce rule in all search warrant entries; the probability that one or more of the occupants of any premises has access to a gun would, *ipso facto*, establish exigent circumstances making a no-knock entry reasonable.

Perhaps aware that its evidence pertaining to firearms proves far too much, the majority attempts to distinguish the dangers associated with executing search warrants related to drugs from the dangers

---

[7] Brief for Petitioner, *Wilson v. Arkansas*, No. 94-5707, 1995 WL 39036, at *42 n.49 (Ark. Jan. 24, 1995) (citing Statistical Abstract of the United States (1992), Tables 409 & 702.

[8] *See State v. Williams*, 168 Wis. 2d 970, 992, 485 N.W.2d 42 (1992) (Abrahamson, J., concurring).

accompanying the execution of any search warrant by claiming that the "risks are only heightened when drugs are involved." Majority op. at 853. However, the crime statistics cited by the majority do not support the contention that "drug related violence is a growing contributor to police mortality." Majority op. at 853 n.8.

As I set forth in my concurrence to *Stevens* , 181 Wis. 2d at 448 n.18, the total number of officers killed on duty declined from 1978 to 1991, as did the number of officers killed in arrest situations involving drug-related matters. Fewer officers (9 officers/4.3 percent) were murdered as a consequence of drug-related violence from 1992-94 than in the periods from 1978-81, 1982-86, or 1987-91.[9] From 1978-94 about twice as many officers were killed in traffic pursuits or stops as were killed in arrest situations involving drug-related matters.[10] During the same years, more officers were killed while answering disturbance calls for family quarrels than were killed in arrest situations involving drug-related matters.[11] The one officer killed in Wis-

---

[9] U.S. Dept. of Justice Hindelang Criminal Justice Research Center, *1994 Sourcebook of Criminal Justice Statistics* at 357.

[10] The total number of law enforcement officers killed in traffic stops or pursuits was 184, while 94 were killed in disturbance calls for family quarrels and 91 were killed in arrest situations involving drug-related matters. During the period 1992-1994, 10 officers were killed in 1992 and 1993, respectively, and 9 were killed in 1994 while engaged in traffic pursuits or stops; during the same years, 3 officers were killed each year in arrest situations involving drug-related matters. *Id.*

[11] *Id.* The number and percentage of officers killed while handling or transporting prisoners in custody doubled between the period 1978-81 and 1987-91. *Id.*

consin in 1995 was answering a domestic disturbance call.

What I stated in my concurrence to *Stevens* remains true today: while the death or injury of even one law enforcement officer is one too many, the empirical evidence cited does not support the majority's rationale that executing search warrants in drug cases is more dangerous to officers than other activities. *Stevens*, 181 Wis. 2d at 449 (Abrahamson, J., concurring). If anything, those statistics argue that if law enforcement officers may dispense with the knock-and-announce rule in drug-related cases, they should be able to dispense with it altogether. Conversely, what *Wilson* teaches is that law enforcement officers may not dispense with the rule of announcement unless they can establish, on a case-by-case basis, that exigent circumstances justify an exception to the rule of announcement and render a no-knock entry reasonable under the Fourth Amendment.

The majority opinion rests on the premise that a knock-and-announce rule increases the likelihood of violence against law enforcement officers. In those cases, a rule of reasonableness would enable the officers to enter without announcement. In many other instances, however, law enforcement officers may expose themselves and other individuals to unnecessary violence when they do not announce their presence.[12]

---

[12] Both the brief federal experience with no-knock entries as well as numerous recent newspaper articles indicate the often lethal risks that no-knock entries can pose to both law enforcement officers and the individuals whose homes they enter.

As I explain in my concurrence to *Stevens*, 181 Wis. 2d at 447-48, a 1970 federal statute authorizing no-knock warrants

Rather than affirming the sweeping blanket exception to the knock-and-announce rule first

was repealed only four years later, following numerous highly publicized no-knock raids in which terrified citizens, imagining that intruders were entering their homes, discovered instead that the "intruders" were law enforcement officers entering without notice. The statute, which was described by one senator as "an invitation to official lawlessness," provoked numerous newspaper articles recounting the details of various no-knock raids; more than 100 of them were reproduced in the *Congressional Record*. In Virginia, a woman who had previously been burglarized shot and killed a young officer who, executing a no-knock warrant, entered her bedroom in the middle of the night; in California, a father was shot through the head in his living room as he cradled his infant son. Both the woman and the man were innocent of any wrongdoing. *See* 119 *Cong. Rec.* 15,170-76 (1973) (collecting articles); 119 *Cong. Rec.* 23,242-58 (same); *see also* Charles Patrick Garcia, *The Knock and Announce Rule: A New Approach to the Destruction of Evidence Exception*, 93 Colum. L. Rev. 685, 704-05 (1993) (describing unfortunate incidents resulting from no-knock raids undertaken in accordance with the 1970 federal statute).

For more recent accounts of injuries to officers and innocent victims in no-knock drug entries, *see, e.g.*, Alan Abrahamson, *Nightmare of Shots in the Dark*, L.A. Times, Dec. 12, 1992, at 1 (U.S. drug agents acting on bad tip failed to identify themselves before making forcible entry; occupant, who thought he was being robbed, shot and wounded agent and was himself shot in leg, arm, shoulder and lung; no drugs found); James Bovard, *No-Knock Entries by Police Take Their Toll on Innocent*, Christian Science Monitor, May 24, 1994, at 18 (no-knock drug raids are frequently mistakes; describes, *inter alia*, no-knock entry in Stockton, CA, in which a 63-year-old homeowner killed a police officer and was then himself killed, although no drugs were found); Hipolito R. Corella, *Police Admit SWAT Team Raided Wrong Home*, Arizona Daily Star, July 29, 1993, at B1 (police crashed through window and detonated stun grenade in

advanced in *Stevens*, I would heed the instructions of the *Wilson* Court and assess the reasonableness of the no-knock entry in this case on the basis of the facts presented. The court's decision today ignores *Wilson*, dispenses with longstanding Fourth Amendment jurisprudence requiring the assessment of reasonableness in each particular case, and may place the very law enforcement officers it purports to protect in greater peril. We should have availed ourselves today of the opportunity to correct our mistake in *Stevens*. Instead we have compounded it.

For the reasons set forth, I concur in the judgment.

townhouse whose inhabitants included three children under five and 75-year-old woman; owner dialed 911 and was told by the dispatcher that "the masked men screaming orders at frightened members of his family were police officers"); Toni Locy, *Police Admit Error, Apologize for Fatal Raid*, Boston Globe, Mar. 27, 1994 at 1 (in a drug raid, police made no-knock entry in wrong apartment, chasing 75-year-old minister, who suffered a fatal heart attack as a result); Sam Stanton, *Cops' Deadly Mistakes in All-Out War on Drugs*, San Francisco Examiner, Feb. 7, 1993 (no-knock drug raids often executed against wrong house, "and the tension involved in facing the unknown can lead to trouble"; describes three incidents involving innocent victims of no-knock entries).