**Walter Harvey BALLARD, Jr., Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 09-01-397 CR.**

Court of Appeals of Texas, Beaumont.

Submitted on March 20, 2003.

Decided May 14, 2003.

**373**

Paul C. Looney, Clay S. Conrad, Lamson & Looney, P.C., Houston, for appellant.

Scott W. Rosekrans, Criminal Dist. Atty., Coldspring, for appellee.

Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

**OPINION**

STEVE McKEITHEN, Chief Justice.

A jury convicted appellant of the offense of Manufacture of a Controlled Substance. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a), (d) (Vernon Supp.2003). The jury further assessed punishment at confinement in the Texas Department of Criminal Justice—Institutional Division for a term of sixteen years and one day. Appellant represented himself at all phases of the trial. Appellate counsel now prosecutes the instant appeal on appellant's behalf. We are presented with three appellate issues, the second of which will be dispositive of the appeal. It reads, "The search of the appellant's home was performed illegally as the officers failed to knock and announce their presence prior to entry."

The record reflects appellant filed numerous pretrial motions, one of which, a suppression motion, raised the "knock and announce" issue. The issue was vigorously litigated in a pretrial suppression hearing. At one point during testimony at the suppression hearing, the State orally stipulated to the fact that announcement of the presence of the police serving the search warrant at appellant's house "was made at the same time the door was breached and entry was made[.]" Our careful examination of the record indicates that at both the pretrial hearing and at trial, the State did not contest the fact that the law enforce-

ment officers serving the search warrant did not knock, announce their presence and wait for a response from the occupants of the dwelling before breaking the door in and entering. The authority for the "knock and announce" doctrine stems primarily from two cases out of the United States Supreme Court, *both unanimous opinions: Wilson v. Arkansas,* 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); and *Richards v. Wisconsin,* 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997).

## APPLICABLE LAW

◼ The purpose [of the Fourth Amendment's requirement of reasonableness] is to preserve that degree of respect for the privacy of persons and the inviolability of their property that existed when the provision was adopted—even if a later, less virtuous age should become accustomed to considering all sorts of intrusions "reasonable."

*Minnesota v. Dickerson,* 508 U.S. 366, 380, 113 S.Ct. 2130, 2138, 124 L.Ed.2d 334, 348 (1993) (Scalia, J., concurring). In *Wilson,* the Court began its discussion of the legal principles involved with the following:

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In evaluating the scope of this right, we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing. *See California v. Hodari D.,* 499 U.S. 621, 624, 111 S.Ct. 1547, 1549–50, 113 L.Ed.2d 690 (1991); *United States v. Watson,* 423 U.S. 411, 418–420, 96 S.Ct. 820, 825–26, 46 L.Ed.2d 598 (1976); *Carroll v. United States,* 267 U.S. 132, 149, 45 S.Ct. 280,

283–84, 69 L.Ed. 543 (1925). "Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable," *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985), our effort to give content to this term may be guided by the meaning ascribed to it by the Framers of the Amendment. An examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering.

*Wilson,* 514 U.S. at 931, 115 S.Ct. at 1916, 131 L.Ed.2d at 980. Later in its opinion, the Court framed the holding, and its proper context, as follows:

Our own cases have acknowledged that the common law principle of announcement is "embedded in Anglo–American law," *Miller v. United States,* 357 U.S. 301, 313, 78 S.Ct. 1190, 1198, 2 L.Ed.2d 1332 (1958), but we have never squarely held that this principle is an element of the reasonableness inquiry under the Fourth Amendment. We now so hold. Given the longstanding common-law endorsement of the practice of announcement, we have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure. . . .

This is not to say, of course, that every entry must be preceded by an announcement. The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests. As even petitioner concedes, the common-law principle of announce-

ment was never stated as an inflexible rule requiring announcement under all circumstances. *See Ker v. California,* 374 U.S. 23, 38, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726 (1963) (plurality opinion) ("[I]t has been recognized from the early common law that ... breaking is permissible in executing an arrest under certain circumstances")[.]

*Id.* at 934, 115 S.Ct. at 1918, 131 L.Ed.2d at 982. (footnote omitted).

In *Richards,* the Court examined a holding by the Wisconsin Supreme Court to the effect that police are *never* required to knock and announce their presence when executing a search warrant in a felony *drug* investigation. *Richards,* 520 U.S. at 387–88, 117 S.Ct. at 1417, 137 L.Ed.2d at 620. The Court disagreed with the Wisconsin Supreme Court's felony drug investigation "blanket exception" to the Fourth Amendment's knock and announce requirement. *Id.* The decision of the Wisconsin Supreme Court relied on numerous "criminal conduct surveys, newspaper articles, and other judicial opinions" indicating that felony drug crimes involve "an extremely high risk of serious if not deadly injury to the police as well as the potential for the disposal of drugs by the occupants prior to entry by the police." *Id.* at 390, 117 S.Ct. at 1419, 137 L.Ed.2d at 621–22 (citing to the Wisconsin Supreme Court's opinion. *See State v. Richards,* 201 Wis.2d 845, 549 N.W.2d 218, 223–27 (1996)). The Court itself acknowledged as "indisputable" that felony drug investigations may frequently involve the threat of physical violence to the police and/or the likelihood that drug evidence will be destroyed if advance notice were given. *Richards,* 520 U.S. at 391, 117 S.Ct. at 1419, 137 L.Ed.2d at 622–23. Rejecting the Wisconsin court's *per se* exception for felony drug investigations, the Court admonished:

But creating exceptions to the knock-and-announce rule based on the "culture" surrounding a general category of criminal behavior presents at least two serious concerns.

First, the exception contains considerable overgeneralization. For example, while drug investigation frequently does pose special risks to officer safety and the preservation of evidence, not every drug investigation will pose these risks to a substantial degree. For example, a search could be conducted at a time when the only individuals present in a residence have no connection with the drug activity and thus will be unlikely to threaten officers or destroy evidence....

A second difficulty with permitting a criminal-category exception to the knock-and-announce requirement is that the reasons for creating an exception in one category can, relatively easily, be applied to others. Armed bank robbers, for example, are, by definition, likely to have weapons, and the fruits of their crime may be destroyed without too much difficulty. If a *per se* exception were allowed for each category of criminal investigation that included a considerable—albeit hypothetical—risk of danger to officers or destruction of evidence, the knock-and-announce element of the Fourth Amendment's reasonableness requirement would be meaningless.

Thus, the fact that felony drug investigations may frequently present circumstances warranting a no-knock entry cannot remove from the neutral scrutiny of a reviewing court the reasonableness of the police decision not to knock and announce *in a particular case.*

*Id.* at 392–94, 117 S.Ct. at 1420–21, 137 L.Ed.2d at 623–24. (footnotes omitted) (emphasis added).

■ The *Richards* Court then framed its holding and its context in the following manner:

> In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, *under the particular circumstances,* would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. This standard—as opposed to a probable-cause requirement—strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries.

*Id.* at 394, 117 S.Ct. at 1421, 137 L.Ed.2d at 624. (emphasis added). Proof necessary to justify a no-knock entry "is not high," but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged. *Id.* at 394–95, 117 S.Ct. at 1422, 137 L.Ed.2d at 624. As such, the burden of proof to show exigent circumstances is on the State.

## STANDARD OF REVIEW

■ We review the denial of a motion to suppress by giving almost total deference to a trial court's determination of historical facts and reviewing de novo the court's application of the law. *See Carmouche v. State,* 10 S.W.3d 323, 327 (Tex. Crim.App.2000). In determining whether the trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App. 1996). Nevertheless, this general rule is

inapplicable where, as in the instant case, the suppression issue is relitigated by the parties during trial on the merits. *Id.* Then, we assess the trial court's ruling in light of the evidence presented at both the suppression hearing and the trial. *Id.* We now turn to the record before us to determine whether the State met its burden to produce the particularized evidence necessary to justify the authorities's no-knock entry into appellant's home.

## RECORD EVIDENCE: PARTICULAR CIRCUMSTANCES

■ As it is not contested that the authorities failed to knock and announce their presence at appellant's house prior to their entry, we will proceed with an examination of the record for evidence of exigent circumstance testimony that would have excused the authorities from the knock-and-announce requirement. The record before us is virtually peppered with bits of testimony attempting to explain what led to the authorities securing a warrant for the search of appellant's house as well as attempts to explain the events leading up to the raid on appellant's house during the early-morning hours of January 15, 2000. On the knock-and-announce issue, the facts are basically not in dispute.

The record indicates that the authorities received information from a confidential informant that appellant was about to engage in the process of manufacturing methamphetamine inside his residence located in San Jacinto County. The lead detective in the case, Philip Cash of the Montgomery County Sheriff's Office, Special Investigations Unit, secured a search and arrest warrant from Judge Robert H. Trapp on January 14, 2000.[1] Detective Cash testified that he specialized in clan-

---

1. Neither the warrant itself or the probable cause affidavit are of any help at all to the State with regard to particularized proof of exigent circumstances excusing the knock-and-announce requirement.

destine methamphetamine lab investigations. Detective Cash further stated that after securing the warrant, the authorities set up surveillance on appellant's house for several hours. Cash described the house as having a few lights on, the doors and windows were closed, a "listening device" was mounted on the front door, no dogs were in the yard, there was no fence, and the windows were covered with a "tarp" hanging from the carport. Significant for our purposes is the fact that Detective Cash testified that this type of covering of the windows as well as the "listening device" was typical of clandestine drug labs. The following line of questioning then occurred:

Q.[State] Now based upon your training and experience, if a clandestine lab operator discovers the approach of somebody from the outside, what *typically*[2] happens?

A.[Cash] They investigate or try to figure out what's going on, who they are, are they friend or foe.

Q. And if they think that whoever's approaching is not a friend, what do they do next *typically?*

A. Flee or arm themselves.

Q. I'm sorry, arm?

A. Yes.

Q. Okay. Now based upon your training and experience in, I guess, these clandestine labs and executing search warrants, have you received special training on how to take these places down?

A. Yes, I have.

Q. And based upon your experience and training, is there a concern for weapons?

A. Yes. In this particular drug—

(Objection omitted).

Q. Now *typically* in your investigations of these illegal methamphetamine labs, why are these labs armed?

A. Due to the people inside the lab, their paranoia, it's something goes with the paranoia. They're gonna arm themselves.

Q. And I think you testified earlier something about people going to rip them off?

A. Yes.

Q. And based upon your training and experience, is that something you've seen or are aware of?

A. I've been made aware of it, yes.

Q. And I guess also because of the creation, is it because of the creation of these units that you're in, that these clandestine labs are subject to being raided by the police?

A. Yes, sir.

Q. And have you or any of your units that you've worked with encountered any problems in raiding *one of these labs?*

A. Yes, sir, we have.

Q. Regarding individuals that have armed themselves?

A. Yes, sir.

Q. Now if you would for the jury *in this particular case,* describe your raid team and the procedure that was used to execute the search warrant?

A. We went to a predetermined location in Shepherd. Our EMS and the fire department met us, which we briefed on the entry again. Who is— you have to appoint people, the ones that are going in first, you have people that breach, the one's that have to break

---

**2.** Any emphasis appearing in quoted testimony from the record before us is of our doing unless otherwise indicated.

doors or windows so the entry team can get in. In this particular case, we had two officers. One of the officers is in a Level B, we call space suits the suits with self containing breathing apparatus, rubber gloves. We were in a rescue mode. If something happened to the officers or one of the defendants in the house, couldn't breathe, we were in the safety suit for the chemicals. We had the barrier against the chemicals to get the officers out safely.

Q. Now you stated earlier that you assemble the location away from the lab. You had the fire department and the EMS there?

A. Yes, sir. *That is standard to clandestine labs.*

(Objection omitted).

Q. Now is it *standard operating procedures* to have fire and ambulance available and in hand while one of these warrants are being executed?

A. *Yes, it is.*

Q. And why would you want the EMS emergency medical services to be present?

A. Due to the problem with the chemicals involved, the *chance* of violence at those locations, or someone getting hurt.

Q. And why would you want the fire department present?

A. 90 percent, 80 to 90 percent of items found in clandestine labs are flammable solvents.

Q. And based on your training, your experience *here locally,* have you *a knowledge* of any of these labs blowing up or catching fire?

A. Yes.

On cross-examination, appellant elicited from Detective Cash that the authorities were unable to see inside his house prior to the raid. Shortly thereafter, the following exchange took place:

Q.[appellant] Let me ask you, Mr. Cash, on the date of January the 14th of 2000, were you familiar with the knock and announce rule?

A.[Cash] Not—no.

Q. You were not?

A. No. I've heard of it but I wasn't—

Q. Have you ever practiced, used that? Have you seen that in general practice?

A. Yes, I've used it myself.

Q. And in your—in the course of your studies, or your seminars and your work as a law enforcement officer, are you familiar with, with the knock and announce rule as provided by the—as interpreted by the United States Supreme Court?

A. What I understand about the knock and announce is on certain type of warrants you do it, on high risk warrants, you don't.

Later during cross-examination, Detective Cash was asked what the confidential informant, a James Allen, related to Cash as to when Allen had last been in appellant's home, and Cash responded that Allen "had been there several times the week prior to that day." (January 14, 2000). Cash also later admitted that, during the course of their surveillance, neither he nor any other officers in the raid team detected any odor emanating from appellant's house that would lead them to believe that methamphetamine was being manufactured.

During the cross-examination of Detective Cash, a rather compelling exchange took place among the participants—State's attorney, Cash, appellant, and the trial court. We characterize it as "compelling" as it appears to neatly frame the subtle, but mandatory, requirement for proving exigent circumstances allowing authorities to bypass the knock-and-announce requirement: *specific facts particular to the ac-*

cused's circumstances at the time of the warrant's execution. See Richards, 520 U.S. at 394, 117 S.Ct. at 1416, 137 L.Ed.2d at 624. The exchange appears of record as follows:

Q.[appellant] 24 box. Why did you breach my door without knocking and announcing?

A. Because of the hazards.

Q. Sir?

A. Due to the hazards in clandestine drug labs, the propensity of the violence to *these people*, the amount of drugs we recover from *these people*, surveillance equipment that are used by *these people*. The mind set of *these people*, the paranoia, they're dangerous people. We consider that a high risk warrant and we put all these factors together and we'll breach the door for that reason.

Mainly officer's safety and the safety of *the suspects*. Try to prevent *them* from getting armed before we can arrest *them*.

Q. And what is it *specifically* that you observed on *my residence or me* or the events that occurred that on—that on the date that you breached the door on of my home, what is it that you saw or that occurred at my home that led you to believe you would not need to knock and announce *other than generally having a guideline?*

A. You talking about prior to breaching the door or after we breached the door?

Q. No. I said *prior to breaching the door.*

A. The history of *people* involved in the methamphetamine trade. The violence associated with *those people* in the methamphetamine trade had led us to believe there was a good chance on a methamphetamine lab that *you're gonna run into weapons, security devices, sometimes bombs, trip wires, numerous other things.* It's just the *history of the drug, history of the people that manufacture it.*

Q. Okay. Now what is it that you saw *specifically about my home* that led you to believe that—wait. That led you to believe that it was justified, a failure to knock and announce prior to?

A. I explained the reason.

Q. Sir?

A. I explained the reason.

Q. There was nothing that you saw at my house.

THE STATE: Objection, Your Honor argumentative.

MR. BALLARD: He's being argumentative with the answer.

THE COURT: Sustained.

Q. Okay. Have you ever seen me be violent? Have you ever specifically seen me be violent?

A. Personally, no.

Q. Did you see me on January the 14th or 15th being violent?

A. No.

Q. Did either one of the defendants, did they resist when—of the officers ran inside the house with their guns?

A. Physically resist, no.

Q. Was there anything that led you to believe that, or was there anything that you had knowledge of that led you to believe that there might be an explosion in that house other than the generalized, what goes on with suspected methamphetamine cases?

A. When houses are sealed and they're cooking dope inside, there's a good chance of an explosion from a gun shot, from friction on the carpet, from someone lighting a cigarette, a spark, metal hitting metal, *it's just the nature of the beast,*

Q. Okay. Is it uncommon for people to seal their house off like to close their windows?

A. Is it uncommon?

Q. Yeah.

A. No.

Q. Is it uncommon to draw the shades, draw their blinds in their house?

A. It's not uncommon.

Q. Was it uncommon on January the 14th for the blinds and curtains in my house to be pulled?

A. Was it uncommon?

Q. Yes, sir.

A. No.

Q. Okay.

A. We have—

Q. Were you the one who made the decision on January the—between January the 14th and January the 15th, were you the one who made the decision to breach the door of my house without knocking and announcing?

A. It was discussed, my commander, myself and the other agents involved but I, I was the case agent. So I'd been responsible for the tactical end of it, getting it set up and so forth. Not so much as who was gonna be the point man but the people, contacting the people to be involved and making sure we had the equipment and everything needed to do that.

Q. Okay. And how long have you—and how long have you been involved in law enforcement?

A. Since June of 1988.

Q. And you were not familiar with the knock and announce rule at that time?

A. I wasn't familiar with the Supreme Court that you quoted so, 1997 Supreme Court case, no, I wasn't aware of that.

Q. Winston versus Wisconsin, that strike anything to you.

THE STATE: Objection, Your Honor, that's just not relevant.

THE COURT: Sustained.

MR. BALLARD: Your Honor, certainly if he has personal knowledge of that case.

THE STATE: Your Honor, it's been asked and answered. He started in on that about an hour and a half ago and he's come full circle again, the same question's been asked and answered.

MR. BALLARD: May I ask him the question, Your Honor?

THE COURT: I sustained his objection, which means no.

The above testimony set the stage for the subsequent "legal crescendo" of an exchange regarding knock-and-announce moments later, also during cross-examination of Detective Cash, and reproduced as follows:

Q.[appellant] Was there anything unusual or that would create an extingient (sic) circumstance where my doors were closed to that house?

A.[Cash] Repeat your question.

Q. Well was there anything that would create any kind of a circumstance that would rise to a belief that you would need to breach my door without knocking and announcing?

THE STATE: Again Your Honor, that's been asked and answered probably half a dozen times in the last hour and a half.

MR. BALLARD: The statement knock and announce has, Your Honor, but I'm asking him whether or not there would be a circumstance that would, with my door being closed, that that would rise to a circumstance that he could ignore the knock an [sic] announce rule.

THE COURT: Are you isolating it to only your door being closed?

MR. BALLARD: Well yes, Your Honor. And he hasn't answered that question.

THE STATE: It's just a different way to ask the same question[.]

THE COURT: Yeah. The mere fact, in other words, would the mere fact that my door was closed.

MR. BALLARD: But the officer testified that his observations—his observations were in setting up a profile that his observations of—the doors were closed, the windows were closed, there was no dogs, no fence that that somehow gave rise to a their [sic] breaching my door without knocking and announcing.

THE COURT: He gave you more reasons than that.

MR. BALLARD: *Other than just his general knowledge and experience—other than my home and those were in general terms, they didn't apply to my home. He spoke in general terms what his experience was and that—what I'm trying to get to is the fact that there was nothing, there was no extingient [sic] circumstance whatsoever for him to ignore the knock and announce rule.*

THE COURT: Mr. Ballard, he's already stated to you the reason why he did what he did.

MR. BALLARD: *And I'm trying to ascertain whether or not those—there was any extingient [sic] circumstances that were particularized to my home, Your Honor, opposed to what he has general knowledge of.*

THE STATE: Mr. Cash has already testified to that. Mr. Ballard's asked that question several times. This is just a different way of asking that same question.

THE COURT: The objection is sustained.

For our purposes in analyzing this issue, it is apparent that both the State and the trial court were satisfied that Detective Cash's responses to appellant's continued questions on specificity and particularity of reasons for failing to knock-and-announce provided both quantity and quality under the applicable law. The record as set out above indicates that is simply not the case. Time and again appellant tried to get Detective Cash to focus on appellant's particular circumstances and time and again Detective Cash responded with generalities and inferences based upon his training and experience with *"those people."* Furthermore, the fact that it is *"the nature of the beast"* for methamphetamine labs to explode along with testimony of possible triggering factors in no way explains why breaching a door without first implementing the knock-and-announce doctrine makes it more likely that an explosion will be prevented. Could not the unannounced entry of the raid team cause friction on carpet? Can an unannounced entry prevent an occupant of a house from lighting a cigarette? Or firing a gun? Or striking a piece of metal with another piece of metal? All of this is pure speculation and runs dangerously close, in our view, of creating the type of *per se* category of criminal investigation the Supreme Court unanimously rejected in *Richards. See Richards,* 520 U.S. at 394, 117 S.Ct. at 1416, 137 L.Ed.2d at 624.

We will not reproduce other knock-and-announce testimony from other members of the raid team from the trial testimony as none provide any further enlightenment on the subject. Neither will we relate or reproduce Detective Cash's testimony from the pretrial suppression hearing on this issue as it is basically identical to his trial testimony set out above. We will, however, examine certain other testimony of Detective Cash elicited during the State's case-in-chief, as well as testimony

of James Allen, the confidential informant, and neighbor of appellant at the time of the raid, elicited during the case for the defense. We were referred to these portions of testimony by the State in a supplemental brief on the issue of exigent circumstances submitted at our request.

We first set-out the portion of direct examination testimony of Detective Cash during the State's case-in-chief:

> Q.[State] Now in all your conversations with Mr. Allen [the confidential informant] regarding the goings on inside Mr. Allen's house, do you recall whether you asked Mr. Allen about any firearms that is [sic] Mr. Ballard may or may not have in his own?
>
> MR. BALLARD: Your Honor, I'm gonna object at this time. Object that it's hearsay.
>
> THE STATE: I'm asking Mr. Cash if he remembers asking Mr. Allen whether or not there were any guns in the house, not what Mr. Allen said.
>
> THE COURT: Yeah. All right. You remember asking not what he said.
>
> A. I recall talking to Mr. Allen about it but I don't remember when · it was. It was either before or after the search warrant.
>
> Q. Now you do recall a conversation with Mr. Allen about firearms and—
>
> MR. BALLARD: Your Honor, he's leading the witness.
>
> A. Yes, I do.
>
> THE STATE: I just asked if he recalls the conversation. He doesn't know if he doesn't remember the conversation.
>
> MR. BALLARD: And he's leading the witness by predicating if he recalls the conversation and then predicating what he wants this man to testify to.
>
> THE STATE: Just trying to clarify for the jury. On cross examination he

went into great lengths about whether or not he had any firearms in the house.

> THE COURT: Objection overruled. Let's proceed.
>
> Q. You just don't know, do you know exactly when it was before or after?
>
> A. No, I don't recall that.
>
> Q. Do you recall the conversation regarding firearms?
>
> A. Yes.
>
> THE STATE: Pass the witness.

At most, all this testimony indicates is that Detective Cash recalled a conversation with Mr. Allen about whether appellant "may or may not" have had firearms in his house. The State does not direct our attention to anywhere in the record supporting its representation to the trial court that appellant's cross-examination of Cash "went to great lengths" concerning firearms in his house. At any rate, this is the extent of the State's evidence from any law enforcement officer involved in the investigation of appellant regarding "knowledge" of firearms in appellant's house.

We are next directed to the cross-examination testimony of James Allen elicited by the State during the case-in-chief for the defense. We reproduce it as it appears in the record:

> Q.[State] Now prior to Mr. Cash and the rest of the task force executing the search warrant on Mr. Ballard's home, do you recall whether or not you had any conversations with Philip Cash about any guns that might have been in Mr. Ballard's house?
>
> A.[Allen] Yes, sir. He asked me one time. I can't remember what time that was, about three or four months of the conversation, he asked me if he had any guns in the house and I said not that I recall. *I know that he had one, I believe it was a nine millimeter. It was all tore apart and he needed a part for it.*

*I knew it wasn't in working condition. Other than that, I don't think he had any other weapons in there.*

Q. But you do recall a conversation with Mr. Cash where you did describe that he did have a gun?

A. Just that nine millimeter.

Q. All right.

A. It was either a nine millimeter or a .44, I'm not real sure what it was.

Q. Revolver or automatic?

A. I don't even know if I ever seen it or not, to tell you the truth, he just talked about I needed some parts for it.

■ We fully recognize that *Richards* and its progeny emphasize the State's proof of particular exigent circumstances justifying a no-knock entry is "not high," *Richards*, 520 U.S. at 394, 117 S.Ct. at 1422, 137 L.Ed.2d at 624, but the proof must at least indicate an unequivocal knowledge on the part of the authorities of the particular exigent circumstance(s) asserted. The first part of James Allen's testimony stated that he told Detective Cash that he [Allen] did not recall appellant having any guns in his house. Then the emphasized portion of Allen's testimony consists entirely of Allen's personal knowledge of a handgun belonging to appellant. There is no indication that the existence of the "nine millimeter" was also known by Detective Cash. Finally, Allen cannot recall if the handgun was actually a nine millimeter or a ".44," with Allen concluding his testimony on this point by admitting that he may have never actually seen a weapon but may have only been told of such a weapon by appellant. At

any rate, Allen appeared to have believed the handgun was not functional. Additionally, the mere presence of a handgun, functional or not, is insufficient, as an exigent circumstance exception to the knock-and-announce rule, where the State does not also prove the authorities possessed information that the individual(s) subject to the warrant was likely to use the weapon, was likely to become violent, had a criminal record reflecting violent tendencies, or a verified reputation of a violent nature. *See United States v. Bates,* 84 F.3d 790, 795–96 (6th Cir.1996).[3] The record before us does not indicate that appellant was known to be violent or to have ever exhibited violent tendencies.

The combined testimony of Detective Cash and James Allen, proffered to us by the State, consists of unparticularized recollections which, we believe, do not amount to the proof necessary to justify the no-knock entry made by the authorities on appellant's house. Furthermore, in the reproduced portions of testimony set-out earlier in this opinion, we attempted to emphasize the extensive generalizations that made up the entirety of Detective Cash's rationale for a no-knock entry. Again, the Supreme Court in *Richards* was fully aware of the real-life "horrors" facing authorities in felony drug investigations. Nevertheless, the Court essentially condemned carving out "special circumstances of today's drug culture" as a basis for abandoning the knock-and-announce rule. *Richards*, 520 U.S. at 392, 117 S.Ct. at 1420, 137 L.Ed.2d at 623.

**3.** For the average person, it is lawful to possess firearms within one's home in Texas, not to mention possess concealed handguns if licensed, the additional proof of a suspect's violent past and/or violent tendencies seems necessary in order to declare a no-knock entry reasonable under the Fourth Amendment.

Indeed, a finding of exigency from the mere presence of a handgun in a dwelling would effectively sanction a no-knock entry in every drug case in Texas. *See Price v. State,* 93 S.W.3d 358, 368 (Tex.App.-Houston [14th Dist.] 2002, pet. filed).

The evidence before us implicates the two concerns the *Richards* Court discussed: 1) considerable overgeneralization, and 2) the chameleon-like nature of *per se,* or categorical, exceptions to the knock-and-announce rule. *Id.* at 393–94, 117 S.Ct. at 1421, 137 L.Ed.2d at 623–24. The State would simply have us carve out a no-knock exception for "clandestine methamphetamine labs" as they pose a danger of explosion and the release of toxic gases. Is this "nature of the beast" any more dangerous to authorities executing a search or arrest warrant at a dwelling than the generalized litany of weapons and other protective devices that are "typically found" in houses belonging to felony drug possessors, dealers, or manufacturers? *See State v. Richards,* 201 Wis.2d 845, 856–66, 549 N.W.2d 218, 223–27 (1996) (extensive discussion by Wisconsin Supreme Court on the dangers to authorities executing search warrants). Under the record before us, the State has failed to carry its burden to provide adequate evidence to justify its no-knock entry of appellant's house. The trial court abused its discretion in denying appellant's motion to suppress on that basis.

Having found constitutional error in the admission of the evidence in question, we must reverse the conviction unless we conclude beyond a reasonable doubt that the error made no contribution to the conviction or the punishment. Tex.R.App. P. 44.2(a). In the instant case, the complained-of evidence includes the methamphetamine which appellant was charged with manufacturing. As such, the error contributed to appellant's conviction. *See McQuarters v. State,* 58 S.W.3d 250, 258 (Tex.App.-Fort Worth 2001, pet. ref'd). We sustain Issue Two.[4] We reverse the judgement of the trial court and remand

the cause to said court for further proceedings.

REVERSED AND REMANDED.

DAVID B. GAULTNEY, Justice, dissenting.

I respectfully dissent. The showing necessary to justify a no-knock entry is not high. *Richards v. Wisconsin,* 520 U.S. 385, 117 S.Ct. 1416, 1422, 137 L.Ed.2d 615 (1997). In *Richards,* the Supreme Court described the required showing as follows:

> In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.

*Id.,* 520 U.S. at 394, 117 S.Ct. 1416. Detective Cash testified to various dangers associated with methamphetamine production: explosions, violence, weapons, trip wires, and bombs. The particular circumstances here included specific information from an informant that Ballard would be manufacturing, or "cooking," methamphetamine at the time of the raid, and the house was "sealed." Detective Cash explained that when these two circumstances are present, "there's a good chance of an explosion" from a gunshot or other spark. Detective Cash also explained that a no-knock entry prevents a methamphetamine manufacturer from arming himself before he can be arrested. The State had evidence defendant had a gun; the State was not required to assume the gun was in disrepair. A fire truck was present in the event of an explosion, and some of the

---

4. Having sustained Issue Two, we decline to address the remaining two issues as they can afford no greater relief to appellant should they also be sustained.

officers had on protective chemical suits. Under the specific circumstances presented, the no-knock entry was justified by a reasonable suspicion that knocking and announcing would be dangerous or would inhibit the effective investigation of the crime in progress—the manufacture of methamphetamine. The trial court's decision should not be reversed.