

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00221-CR

_____

KAREN MICHELLE WOOLVERTON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th Judicial District Court
Bowie County, Texas
Trial Court No. 08F0746-005

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Karen Michelle Woolverton was convicted by a Bowie County jury of possession[1] and manufacture[2] of a controlled substance, methamphetamine, and was sentenced to ten years' and forty years' confinement, respectively, in the Texas Department of Criminal Justice. Both sentences are to run concurrently. On appeal, Woolverton contends that the trial court erred in (1) admitting evidence obtained through a warrantless search of a residence occupied by her as a co-tenant without her consent and (2) admitting an unauthenticated journal into evidence over trial counsel's hearsay objection. Because we find no error on the part of the trial court, we affirm the convictions.

I.    FACTS

After having received information from their supervisor that illegal narcotics activity was taking place at a residence located outside of New Boston, Bowie County Sheriff's Deputies Stacey Sumner and Nathan Head traveled to the residence, a single-wide manufactured home, to investigate. Sumner testified that he knew that an individual, Todd Copeland, owned and occupied the residence. When Sumner and Head arrived at the residence, Copeland came outside to speak with them, meeting them at the gate to the property; he then confirmed that he was the owner of the residence. At that time, Sumner requested Copeland's consent to search the

---

[1]TEX. HEALTH & SAFETY CODE ANN. § 481.115 (Vernon 2010).

[2]TEX. HEALTH & SAFETY CODE ANN. § 481.112 (Vernon 2010).

2

residence. Copeland agreed and provided written consent for the search, then returning to the residence and retrieving the remote control to open the gate to the property. When Sumner and Head entered the residence, they encountered Woolverton, who queried the officers regarding their reason for their presence in the house.

There is a conflict in the testimony as to what occurred at this point in time. Whereas Sumner testified that Woolverton never denied permission to search the residence and that the issue of Woolverton's consent never arose at that time,[3] Woolverton testified to the contrary. She contended that when the officers informed her they had obtained Copeland's permission to conduct the search and requested that she exit the premises while the search was conducted, she responded, "I didn't give anybody consent to search" and, "I'm refusing a search of anything of mine unless you can tell me why you're here and show me a search warrant."

Upon a search of the residence, an operational methamphetamine laboratory was discovered. Lance Cline, an agent with the Texas Department of Public Safety Criminal Investigation Division, was contacted. Upon his arrival, Sumner advised Cline of Copeland's consent to the search. Prior to entering the residence, Cline likewise sought Copeland's consent to search, which was freely given. At that time, Cline interviewed Woolverton, whose face appeared to be sunken, and who was thin and pale. Cline believed Woolverton lived in the residence, because he had previously received information that she had been contacting a website

---

[3]Head did not testify on this issue.

3

attempting to have ephedrine sent to that address.[4] Woolverton confirmed Cline's belief when she indicated she lived in the residence; further, there were women's clothes on site and Copeland confirmed that she resided there with him. Cline indicated that Woolverton did not voice any objection to him of the search. After having been advised of her *Miranda*[5] rights, Woolverton provided Cline information for a statement in which she indicated that she knew methamphetamine was being manufactured at the residence and that she used methamphetamine; she, nevertheless, maintained that the methamphetamine and manufacturing paraphernalia belonged to Copeland and others.[6] Numerous items located at the residence, including methamphetamine, paraphernalia associated with manufacturing methamphetamine, and a drug ledger were confiscated and introduced as evidence at Woolverton's trial.

## II. ANALYSIS

### A. Consent to Search

Prior to trial, Woolverton filed a motion to suppress all evidence obtained from the residence, alleging that the evidence was seized as the result of a warrantless search without probable cause and without her consent, in violation of her constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, Article I, Section 9, of the Texas Constitution, and in violation of Article 38.23 of the Texas Code of Criminal Procedure. TEX.

---

[4]Ephedrine is the primary ingredient in methamphetamine.
[5]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[6]At trial, Woolverton denied having given Cline a statement to this effect. No such written statement appears in the record, and Woolverton maintained her innocence at trial.

CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005). In lieu of ruling prior to trial on Woolverton's motion to suppress, the trial court granted Woolverton's running objection to the introduction of the fruits of the search, withholding any ruling on the motion subsequent to presentation of the evidence. At the conclusion of the evidence, the trial court denied Woolverton's motion to suppress.

A trial court's decision to grant or deny a motion to suppress evidence is reviewed under a bifurcated standard of review. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). The general rule is that an appellate court should afford almost total deference to a trial court's determination of the historical facts supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). At a suppression hearing, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We are also to afford such deference to a trial court's ruling on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. "[W]hether a third party had actual authority to consent to a search of another's property and whether an officer was reasonable in finding that a third party had apparent authority to consent are mixed questions of law and fact which reviewing courts should examine de novo." *Hubert v. State*, 312 S.W.3d 554, 559–60 (Tex. Crim. App. 2010). Where findings of fact are not entered,

we view the evidence in the light most favorable to the trial court's ruling and "assume the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We review the application of the law of search and seizure to the facts de novo. If the trial court's ruling is "reasonably supported by the record and is correct on any theory of law applicable to the case," we are not at liberty to disturb that ruling. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

The issue before the trial court was one of whether a search warrant was necessary in light of the written consent to search given by Copeland, a cotenant of the premises. We begin with the presumption that a warrantless entry by police into a person's home is unreasonable under the Fourth Amendment,[7] which protects individuals against unreasonable searches and seizures, unless the entry falls within an exception to the warrant requirement. *Valtierra*, 310 S.W.3d at 448. A warrantless search made without probable cause is valid under the Fourth Amendment with proper consent, voluntarily given. *United States v. Matlock*, 415 U.S. 164, 165–66 (1974). Consent to search "must be shown to be positive and unequivocal, and there must not be any duress or coercion." *Allridge v. State*, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991).

It is undisputed that Copeland signed a written consent to search the house located at 244 CR 4102 along with the outer buildings and perimeter thereof. No issue has been raised with respect to the voluntariness of Copeland's consent. Rather, Woolverton contends that because

[7]U.S. CONST. amend. IV.

6

she informed the officers that she, too, lived in the residence, and she did not consent to the search, it was then incumbent on the officers to obtain a warrant in order to conduct a valid search of the residence and premises under the Fourth Amendment.

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006); *accord Patrick v. State*, 906 S.W.2d 481, 490 (Tex. Crim. App. 1995). A third party may give consent to search property over which they have joint access or control. *Patrick*, 906 S.W.2d at 490. Where cotenants or joint occupants live at a residence, either tenant may give the law enforcement officer consent to search the premises so long as that tenant has control over and authority to use the premises. *Randolph*, 547 U.S. at 106; *Jones v. State*, 119 S.W.3d 766, 787 (Tex. Crim. App. 2003) ("A third person may validly consent to a search when he has 'equal control and equal use of the property searched.'") (quoting *Welch v. State*, 93 S.W.3d 50, 52–53 (Tex. Crim. App. 2002)).

The question here, as in *Randolph*, might have been whether such evidentiary seizure is lawful with the permission of one occupant when the other, who later seeks to suppress the evidence, is present at the scene and expressly refuses consent. The *Randolph* court determined, under the facts presented in that case, that the co-occupant's stated refusal to permit entry prevails,

7

rendering the warrantless search unreasonable and invalid as to him. *Randolph*, 547 U.S. at 106.

In arriving at this conclusion, the Court reasoned that:

> Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all. Accordingly, in the balancing of competing individual and governmental interests entailed by the bar to unreasonable searches, the cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place. Since we hold to the "centuries-old principle of respect for the privacy of the home," "it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." We have, after all, lived our whole national history with an understanding of "the ancient adage that a man's house is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown."

*Id.* at 114–15 (citations omitted).

Moreover, disputed permission to search is "no match for this central value of the Fourth Amendment, and the State's other countervailing claims do not add up to outweigh it." *Id*. at 115–16. The Court therefore held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id*. at 120.

However, unlike *Randolph* (where the nonconsenting inhabitant's refusal was clear and undisputed), the question of whether Woolverton refused to consent to the search is disputed in this case. Woolverton is unequivocal in her testimony that such refusal was communicated to Sumner, with Head standing in the doorway. Sumner, on the other hand, is equally unequivocal

8

in his testimony that Woolverton made no objection to the search. When asked by the State if Woolverton ever told Sumner he could not search, Sumner stated that Woolverton made no such objection. Sumner further testified that when Woolverton was asked to vacate the residence, she complied without ever communicating to Sumner the fact that she lived in the residence. While Sumner did learn that Woolverton resided at the residence after he arrived on the premises, he did not proactively seek her consent because Copeland had previously provided written consent to search.

Head testified that he witnessed Sumner obtain Copeland's written consent to search the residence and surrounding buildings. Head and Sumner were then unaware of Woolverton's presence in the residence and did not learn of it until after the consent had already been signed and they entered the residence. Head testified that he had no knowledge of whether Woolverton was asked for consent to search and did not himself seek consent for the search from Woolverton. Cline testified that after he arrived, he interviewed Woolverton; during that interview, Woolverton never indicated to Cline that she was withholding consent to search. In fact, Woolverton indicated that she knew methamphetamine was being manufactured at the residence and that she had used methamphetamine.

After having heard the conflicting testimony regarding Woolverton's lack of consent to search, the trial court stated:

> [T]he Georgia case is clear that consent to search by one owner or occupant of the residency [sic] is sufficient unless the other owner or occupant objects, and in that

9

particular case, it was, there was a domestic dispute. The wife, co-owner of the house, gave consent to the officers to search the residence while the husband vigorously objected.

In this case, it comes down to a credibility determination and the Court finds that the testimony of the defendant in this case is not credible and the Court finds that the testimony of the officers is credible, that she did not object, that she was cooperative, that she did not even inform them that she resided there, although I think there was some testimony by one of the officers that he knew that. But she never objected to the search.

. . . .

[T]he Court finds that the defendant, Karen Woolverton, was physically present but does not find that she refused consent. Therefore, the consent given by Mr. Copeland was sufficient to serve as an exception to the warrant requirement and the motion to suppress is denied.

The trial court correctly applied the law of search and seizure to the facts of this case. The resolution of the issue of whether a warrant was, in fact, required in order to search the premises in question rests upon the issue of whether Woolverton refused consent to the search. This issue turned on the credibility and the demeanor of the witnesses. Because the findings of the trial court are based on an evaluation of credibility and demeanor of the witnesses, we defer to those findings as they are supported by the record. *Guzman*, 955 S.W.2d at 89. We overrule this point of error.

**B.      Admissibility of the Drug Ledger**

In her second point of error, Woolverton contends that the trial court abused its discretion by admitting an unauthenticated journal into evidence over trial counsel's hearsay objection. A trial court's admission or exclusion of evidence is reviewed under an abuse of discretion standard.

10

*Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002); *see also Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994) (holding that ruling on admissibility of out-of-court statement under hearsay exception is within trial court's discretion, subject to review only for abuse of discretion).

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d); *see also* TEX. R. EVID. 801(c). A statement not offered to prove the truth of the matter asserted is not hearsay. *Dinkins v. State*, 894 S.W.2d 330, 347–48 (Tex. Crim. App. 1995) (holding that appointment book and patient application form were not hearsay when "tendered . . . to show how appellant became a suspect in the investigation," not for the truth of the matter asserted).

At trial, the State offered into evidence a pink notebook, containing handwritten drug ledger information. Woolverton objected to the admission of the notebook as hearsay. In overruling Woolverton's objection, the trial court determined that the notebook was not being offered for the truth of the matter asserted, and thus was not hearsay. Woolverton maintains the notebook was indeed offered to prove the truth of the matters asserted therein. Cline's testimony provided a detailed outline of the meaning of the entries in the notebook,[8] which contains initials and details of drug transactions. Cline described the pink notebook as a "drug ledger" that he

---

[8]Woolverton did not object to Cline's testimony regarding the contents of the ledger, such as the initials of each individual and the amount of methamphetamine they may have purchased and the cost of various purchases.

found inside the residence and opined that the presence of the drug ledger indicates that drug sales were occurring at the location where it was found.

Although we find no Texas or Fifth Circuit cases addressing this particular issue, many courts have allowed the introduction of "drug ledgers," not for the truth of the entries on the ledgers, but as circumstantial evidence that drug-related activities were occurring on the premises where the records were found. In *United States v. Wilson*, 532 F.2d 641, 645–46 (8th Cir. 1976), the court ruled that certain records that were found on the premises where the prosecution alleged that drug trafficking was occurring were admissible as circumstantial evidence that drug trafficking was occurring on the premises. In *United States v. Mendez*, 514 F.3d 1035, 1045 (10th Cir. 2008), a drug ledger containing lists of names with dollar amounts was admitted into evidence over the defendant's hearsay objection. The court determined that these statements were offered not for the truth of the matter asserted (i.e., that particular individuals actually owed money); rather, the lists were admitted to show that the notebook was a drug ledger, and therefore a "tool of the trade." *Id.*; *see also United States v. Gonzales*, 307 F.3d 906, 910 (9th Cir. 2002) (where prosecutors sought to introduce pay/owe sheets as tool of the trade, the admission did not implicate the rule against hearsay when admitted for limited purpose of showing the character and use of an apartment).

In the case at bar, Cline collected copious evidence related to the possession and manufacture of methamphetamine at the residence in question. Such evidence included three

pistols, a trash can containing discarded items often associated with methamphetamine production, numerous receipts for pseudoephedrine, a shopping list of what is needed to get a "methamphetamine cook" started, three glass pipes for smoking methamphetamine, a box of Actifed Cold & Allergy medication (a common source for pseudoephedrine), a bottle of iodine (necessary in the processing of methamphetamine), a methamphetamine test kit, methamphetamine, camping fuel (a solvent used in the manufacture of methamphetamine), an apparatus through which methamphetamine was smoked, muriatic acid (used in the manufacture of methamphetamine), a hydrogen peroxide bottle fashioned into a hydrogen chloride generator, scales with visible yellow residue (commonly found in a methamphetamine laboratory), a "huge" jug of sulfuric acid and jar tops with holes for tubing (both items commonly used in the manufacture of methamphetamine), and a broken Erlenmeyer flask (a piece of glassware often found in a methamphetamine laboratory).

Like the other items of evidence found throughout the residence, the drug ledger here is a "tool of the trade" and is an item commonly associated with the practice of trading in illegal narcotics. The record does not indicate that the ledger was used to prove particular drug transactions that were elements of extraneous crimes or of any type of drug conspiracy.[9] Thus, the drug ledger was not admitted to prove the truth of the matters asserted therein. That is, the initials and other entries in the ledger were not admitted to show the persons whose initials were

_____

[9]Woolverton did not request a limiting instruction regarding the drug ledger, limiting same from proving anything other than the character and use of the place where it was located.

13

listed therein actually owed the amount of money listed or purchased the quantities of drugs listed; rather, they were admitted to show that this "drug ledger" is a tool of the drug dealing trade, and thus is circumstantial evidence that drug trafficking was occurring on the premises. We find no abuse of discretion on the part of the trial court in admitting the drug ledger. We overrule this point of error.

## III. CONCLUSION

We affirm the judgment of the trial court.

Bailey C. Moseley
Justice

Date Submitted: September 10, 2010
Date Decided: September 14, 2010

Publish

14