

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-10-00199-CR

_____


JAMES SUNNY BURTON, Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 354th Judicial District Court
Hunt County, Texas
Trial Court No. 25,928



Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

James Sunny Burton, having been charged with possession of less than one gram of methamphetamine, filed a motion to suppress evidence, claiming an unlawful search. The trial court denied suppression of the evidence. After a jury was empaneled, Burton announced that he would waive his right to a jury trial. The State did not acquiesce and Burton entered a plea of guilty to the offense, the evidence was stipulated, and Burton was found guilty by the jury. Submitting the issue of punishment to the court, he was sentenced to two years' confinement.[1]

On appeal, Burton challenges the trial court's denial of Burton's motion to suppress. The State maintains that Burton waived his right to appeal, contending that he had to make his plea of guilty conditional upon his right to appeal.

Before addressing Burton's complaint on appeal, we will discuss the State's contention that Burton waived his right to appeal his conviction.[2]

**Waiver of Right to Appeal?**

In its contention that Burton has waived his right to appeal, the State cites *Shallhorn v. State*, 732 S.W.2d 636 (Tex. Crim. App. 1987). The result in *Shallhorn* turned in large part on *Helms v. State*, 484 S.W.2d 925 (Tex. Crim. App. 1972), which was modified by *Young v. State*,

---

[1]A second indictment charged Burton with possession or transport of certain chemicals with intent to manufacture a controlled substance. TEX. HEALTH & SAFETY CODE ANN. § 481.124 (Vernon 2010). He also pled guilty to that offense and was sentenced to seven years' incarceration (see cause number 06-10-00200-CR on the docket of this Court). Both cases were addressed in one proceeding in the trial court and Burton has filed one appellate brief attacking both convictions. Our resolution of Burton's points of error in this opinion likewise address his complaints in the second conviction.

[2]There is no waiver of appeal in the record.

2

8 S.W.3d 656, 666–67 (Tex. Crim. App. 2000) (a valid guilty plea does not waive defendant's right to appeal unless judgment of guilt rendered independently of error asserted). In a case such as Burton's, where the evidence sought to be suppressed was drugs and other contraband, the judgment of guilt is not independent of the trial court's ruling on the suppression motion. *Young*, 8 S.W.3d at 667; *Hargrove v. State*, 40 S.W.3d 556, 558–59 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

> A defendant in Texas has a statutory right to appeal his conviction:

> A defendant in any criminal action has the right of appeal under the rules hereinafter prescribed, provided, however, before the defendant who has been convicted upon either his plea of guilty or plea of nolo contendere before the court and the court, upon the election of the defendant, assesses punishment and the punishment does not exceed the punishment recommended by the prosecutor and agreed to by the defendant and his attorney may prosecute his appeal, he must have permission of the trial court, except on those matters which have been raised by written motion filed prior to trial. This article in no way affects appeals pursuant to Article 44.17 of this chapter.

TEX. CODE CRIM. PROC. ANN. art. 44.02 (Vernon 2006); *see also Ex parte Broadway*, 301 S.W.3d 694, 697 (Tex. Crim. App. 2009). A defendant may, however, waive this right, if the waiver is executed voluntarily, knowingly, and intelligently. *Broadway*, 301 S.W.3d at 697 (citing TEX. CODE CRIM. PROC. ANN. art. 1.14; *Monreal v. State*, 99 S.W.3d 615, 617 (Tex. Crim. App. 2003)). Where a waiver of appeal is entered prior to adjudication and sentencing, has not been bargained for, and the precise terms of punishment are uncertain, the waiver is not made voluntarily, knowingly, and intelligently. *Ex parte Delaney*, 207 S.W.3d 794, 796–97 (Tex. Crim. App.

3

2006).[3]   Nevertheless, if some form of bargain is made between the State and the defendant, the waiver may be upheld.   The Texas Court of Criminal Appeals distinguished *Delaney* from the situation in *Broadway*:   Broadway hoped the trial court would grant him deferred adjudication community supervision, and so waived his right to a jury trial.[4]   The trial court found the State did not want to acquiesce in this waiver of jury trial, and thus Broadway induced the State's consent with his plea of guilty.   The State gave consideration (its consent to join in Broadway's waiver of a jury trial) and, hence, Broadway's waiver of appeal was part of a bargain.   *Broadway*, 301 S.W.3d at 697–98.

As discussed above, we do not find that *Shallhorn* stands for the proposition that a defendant entering an open plea of guilty must specifically preserve the right to appeal the denial of a pretrial motion to suppress.   *See* TEX. CODE CRIM. PROC. ANN. art. 44.02.   The State also cites *Simpson v. State*, 67 S.W.3d 327 (Tex. App.—Texarkana 2001, no pet.), in support of its position.   In *Simpson*, we held that Simpson's plea of guilty waived any claim of error in the trial court's denial of the motion to suppress.   This holding was based on our finding that the judgment of guilt was based on Simpson's plea of guilty (to the offenses of aggravated robbery and

---

[3]Delaney entered a plea of guilty without a negotiated plea agreement in place, and waived his rights to a jury trial and appeal.   He was placed on deferred adjudication community supervision; subsequently, he was adjudicated guilty, his supervision revoked, and he received a life sentence.   The Texas Court of Criminal Appeals found the waiver of appeal was not voluntary, knowing, and intelligent because when the waiver was made—at the time of the initial plea and before guilt was pronounced—Delaney could not know what his punishment would be.   "[S]imply knowing the range of punishment for the offense is not enough to make the consequences of a waiver known with certainty." *Delaney*, 207 S.W.3d at 799.

[4]*See* TEX. CODE CRIM. PROC. ANN. art. 1.13.

4

unauthorized use of a vehicle) and therefore was independent of any alleged error in the suppression ruling. As stated earlier, a case such as Burton's, where the evidence sought to be suppressed was drugs and other contraband, the judgment of guilt is not independent of the trial court's ruling on the suppression motion. *Young*, 8 S.W.3d at 667; *Hargrove*, 40 S.W.3d at 558–59. A defendant who enters an open plea (i.e., pleads guilty, but not as the result of a plea bargain) may still appeal written pretrial motions under Article 44.02. *See Monreal*, 99 S.W.3d at 620 ("both bargaining and non-bargaining defendants can appeal rulings on written, pre-trial motions as well as jurisdictional issues").

There is no evidence in the record here that Burton waived his right to appeal. The record shows that he entered an open plea of guilty, preserved his challenge to the State's evidence with a motion to suppress evidence which was ruled on (although adversely to him) by the trial court, and received permission from the trial court to appeal.[5] Accordingly, we find that Burton did not waive his right to appeal.[6]

**The Suppression Hearing**

A hearing was conducted on Burton's motion to suppress evidence. In that hearing, Hunt County Sheriff's Officer Larry Proctor testified that he received information about a "possible drug lab that was in the process of cooking methamphetamines" at a residence at 601 Quail Run in

---

[5]*See* TEX. R. APP. P. 25.2.

[6]Even if, as the State urges, Burton's plea of guilty were taken to amount to a waiver of appeal, it could not be said such waiver was made voluntarily or knowingly, as Burton's punishment was yet to be determined and no bargaining had occurred. *See Delaney*, 207 S.W.3d at 799.

West Tawokoni. Proctor said that another police officer told him about an informant who was then in custody, but Proctor could not recall if he had ever worked with or met with this informant prior to this occasion. The informant had been arrested a couple of hours prior to talking to Proctor, but Proctor was unaware of the nature of the charge upon which the informant was being held. Proctor acknowledged he had no information at the time the statement was made to him that it was worthy of reliance. When asked for any corroborating information or anything to suggest the informant's statement was reliable, Proctor responded, "Just the fact that he stated that he had assisted in dropping off some of the items for the lab. . . . Some of the precursors." Proctor said he did not know what precursors had been "dropped off," as Proctor did not have that information with him at the hearing and Proctor did not indicate that the informant told him when these precursors had been left at the site by the informant. Although Proctor testified that he thought he had made an audio visual recording of the informant's statement, he was unsure whether this had been done and there was neither an affidavit nor a written statement by the informant mentioned or introduced.

After speaking to the informant, Proctor gathered several other officers and went to the location with the intention "to go down there and see if I could observe anything in that area." This was sometime between about 10:30 p.m. and midnight. At the location, Proctor said there was a "strong northerly wind . . . and you could smell a strong odor of ammonia coming from that location." According to Proctor, there were twenty to twenty-five houses on this particular street;

6

the mother of one of the house's occupants lived next door, and the next closest residence was about 200 yards away. Based on the smell of ammonia and what he had been told by the informant, Proctor testified he believed "exigent circumstances" existed. "It's a hazardous situation. You've got open flames. Too much of it in one location you can cause fires or explosions, things like that." Proctor did not explain what open flames, if any, he observed on the site before he entered the house. After entering the house, he extinguished some open flames, but he did not offer anything more specific and did not say how, while still outside the house, he was aware that these open flames existed.[7] Based on these circumstances (an unidentified informant, whose reliability was not then apparently known by Proctor, which informant had claimed to have delivered unspecified precursors to the location, and a strong smell of ammonia at the location), Proctor and the other officers on the scene tried to make contact with occupants of the house. Proctor testified that one person (not identified in his testimony) was found in the yard; Proctor did not testify what was done with this person. At that point, Proctor entered the residence and made contact with Burton, who was the only person in the house. Proctor detained Burton, searched the house, extinguished the open flames, and called for a HazMat[8] team. After he testified about detaining Burton, clearing the house of hazards by extinguishing the open flames, and calling for the HazMat team, Proctor testified as follows:

---

[7]Proctor said after entering the house and detaining Burton, Proctor "cleared the residence for any hazards, for any open flames, which there was. I had them put out and then I called for the HazMat team."

[8]Although not specified in the testimony, we infer this means a team trained to deal with hazardous materials.

A. . . . I had to go back out to my vehicle and get my breathing apparatuses and stuff to go back inside.

Q. [Prosecutor] And can you describe to the Judge what stage of the production of methamphetamine did you witness inside that home?

A. [Proctor] Some of it was already complete. Not a whole lot of it but some of it was but they were still in the process of cooking.

Q. And after the HazMat Team arrived and the premises was [sic] secured, were you able to go back in and retrieve additional items or criminal instrumentalities used in the production of methamphetamine?

A. Yes, we did.

Exactly when Proctor saw evidence in the house of a methamphetamine laboratory is not clear. The above exchange suggests it was not until after he had "cleared" the house, retrieved his breathing apparatus, then re-entered the house that he observed the methamphetamine-making operation. Later, under cross-examination, Proctor testified as follows:

Q. [Defense Attorney] The moment you smelled the ammonia or the anhydrous, did you call HazMat immediately?

A. [Proctor] It wasn't immediately, no. We had to secure the area.

Q. And that was after you entered the residence. Correct?

A. No, ma'am. We started securing the area prior to entering the residence.

Q. You called HazMat after you entered the residence?

A. Yes, ma'am.

8

Q. And you said they were in the process of having - - or in the process of making the methamphetamine. Correct?

A. That's correct.

Q. At what stage were they in the process?

A. About half-way through.

At no time did Proctor attempt to secure a search warrant. When he smelled ammonia, he testified that he believed exigent circumstances existed and, because of those exigent circumstances, he did not have sufficient time to seek the issuance of a search warrant. Several items, including soaking or boiling fertilizer and some finished methamphetamine, were subsequently found. Proctor also said that when he and the other officers arrived, neither Burton nor anyone else was taking any actions suggesting the danger of the destruction of evidence. However, Proctor testified that he believed that if the parties present would have "noticed us out there, they would have started destroying" evidence.

**Reviewing Trial Court's Ruling on Suppression**

We review a denial of a motion to suppress for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). A trial court's decision to grant or deny a motion to suppress evidence is reviewed under a bifurcated standard of review. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). The general rule is that an appellate court should afford almost total deference to a trial court's determination of the historical facts supported by the record, especially when the trial court's fact-findings are based on an evaluation of credibility and

9

demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). At a suppression hearing, the trial court is the exclusive trier of fact and the judge of the credibility of the witnesses. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We are also to afford such deference to a trial court's ruling on "application of law to fact questions" (also known as "mixed questions of law and fact") if the resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. On the other hand, we review a trial court's rulings on mixed questions of law and fact de novo if they do not turn on the credibility and demeanor of witnesses. *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). We sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003). When a trial court does not enter express findings of fact on the court's suppression ruling, the reviewing court must view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact which support its ruling so long as those findings are supported by the record. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

**Warrantless Search**

Proctor's search of Burton's residence was done without a warrant. Once a defendant has made an initial showing that a search or seizure was without a warrant, the burden of proof shifts to the State to show the search was either in fact made with a warrant or that it was a reasonable search. *Ford*, 158 S.W.3d at 492. Generally, the Fourth Amendment to the United States

10

Constitution prohibits the government and its agents from searching the person or the property of individual citizens without a search warrant. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003); *see* U.S. CONST. amend IV. There are, however, exceptions to the Fourth Amendment's warrant requirement. One such exception arises when the government's representative (typically, a peace officer) has accumulated sufficient facts that when those facts are considered in the aggregate, the officer has probable cause to believe (1) that a crime is being committed and (2) exigent circumstances justify searching without first taking time to secure a search warrant from a neutral magistrate. *Estrada v. State*, 154 S.W.3d 604 (Tex. Crim. App. 2005); *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991). The State claimed that exigent circumstances existed here which justified Proctor's warrantless entry and search. Both probable cause and exigent circumstances must be shown; otherwise, a warrantless entry will not survive Fourth Amendment scrutiny. *Parker v. State*, 206 S.W.3d 593, 597 (Tex. Crim. App. 2006). However, facts known to officers are not to be parsed into either a category of "probable cause" or "exigent circumstances"; "a reviewing court analyze[s] each piece of evidence as part of the totality of information, as it relates to both the probable cause and the exigent circumstances determinations." *Id.* at 601.

**Probable Cause**

"[P]robable cause is the accumulation of facts which, when viewed in their totality, would lead a reasonable officer to conclude, with a fair probability, that a crime has been committed or is

11

being committed by someone." *Id.* at 599; *see also Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009) (probable cause is "a greater level of suspicion than 'reasonable suspicion' and requires information that is more substantial in quality or content and a greater reliability with respect to the source of information"; a "relatively high level of suspicion" though less than the standard for preponderance of the evidence). Probable cause is a fluid concept, analyzed in light of the totality of the circumstances and assessing probabilities in light of the particular facts and circumstances present. *See Dixon v. State*, 206 S.W.3d 613, 616 (Tex. Crim. App. 2006). Where some of the information being considered for a determination of probable cause involves an informant's tip, the informant's veracity and the basis of his knowledge are "relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other . . . ." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 233 (1983)).

The trial court entered no findings of fact and conclusions of law in this case to explain its denial of Burton's motion to suppress; we will view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact in support of the ruling as long as those implicit findings are supported by the record. *Woolverton v. State*, 324 S.W.3d 794, 798 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Valtierra*, 310 S.W.3d at 447). Evidence of probable cause in this case consists of Proctor's testimony that an unidentified informant (whose reliability was unknown to him) at the police station told Proctor the informant

12

had assisted in taking unnamed precursors at some unnamed time to a "possible lab going," together with Proctor's testimony that at the location, he smelled a strong odor of ammonia coming from the residence, which, based on his training and experience, is used in the production of methamphetamine.

In *State v. Steelman*, 93 S.W.3d 102, 104 (Tex. Crim. App. 2002), police officers received an anonymous tip that drug dealing was taking place at the Steelman residence. After looking through a window and observing no illegal activity, they knocked on the door. Ian Steelman answered and came onto the porch, closing the door behind him. The officers detected the odor of burnt marihuana emanating from the residence (but not on Ian himself or his clothes); when Ian went back in to get his identification and tried to close the door, officers prevented him from closing the door, entered, and arrested all of the occupants. *Id.* at 104–05, 108 n.8. The Texas Court of Criminal Appeals held that the arrest and subsequent search were invalid, ruling that odors alone do not authorize a warrantless search and seizure in a home. *Id.* at 108. It is significant that the Texas Court of Criminal Appeals' ruling in *Steelman* centered on its finding that the smell of burning marihuana did not give the officers probable cause to believe Ian had possessed marihuana in the officers' presence.[9] An odor of marihuana may, though, be a factor in a determination of probable cause that an offense has been or is being committed. *Estrada*, 154 S.W.3d at 609.

---

[9]"*Steelman* simply reiterated what previously had been well established: the odor of marihuana emanating from a residence, by itself, is insufficient to establish *both* the probable cause *and* statutory authority required for a warrantless arrest of a particular person inside." *Parker*, 206 S.W.3d at 598.

In *McNairy*, 835 S.W.2d at 103, 106, police officers detected the strong smell of methamphetamine emanating from a trailer house. The officers had extensive specific experience with methamphetamine laboratories. As they approached the trailer house, the officers heard individuals running from the residence into nearby brush. As the officers looked through the doors of the trailer house to see if anyone was present, they observed chemicals associated with the manufacture of methamphetamine. These discoveries were immediately preceded by the officers finding a methamphetamine laboratory on another part of the same ten-acre tract. The court found probable cause existed to justify entrance to the trailer. *Id.* at 106. Under the extant circumstances, the Texas Court of Criminal Appeals also found that the officers could have reasonably believed more suspects remained in the trailer who could have either posed threats to the officers or destroyed evidence. Relying on the possibility of the destruction of evidence, the Texas Court of Criminal Appeals found exigent circumstances existed which justified the officers' warrantless entrance. *Id.* at 107. However, after the initial warrantless entry (during which the officers saw stacks of items used to produce methamphetamine), the officers did not search the trailer house until they had first acquired a search warrant. *Id.* at 103.

Closer to the facts of the instant case are those of *Pool v. State*, 157 S.W.3d 36 (Tex. App.—Waco 2004, no pet.). In that case, the police received a tip of suspicious activities at Pool's house; the tipster reported several propane tanks outside the house and told police that Pool was "probably cooking methamphetamine." *Id.* at 39. While talking with Pool at the front door,

14

they smelled a "chemical." *Id.* Two officers also went around a fence and into Pool's back yard, where they detected a faint smell of anhydrous ammonia and other items potentially used for manufacturing methamphetamine. At this point, the officers left and applied for and obtained a search warrant. The Waco Court of Appeals found there was no probable cause to justify the officers' entry to the back yard. The informant said Pool was "probably" cooking methamphetamine and the officer on the porch only described smelling a chemical; an ammonia smell[10] was not detected until officers entered the back yard. *Id.* at 43.

In *Pair v. State*, 184 S.W.3d 329 (Tex. App.—Fort Worth 2006, no pet.), an officer at the front door of the suspected location smelled what he believed to be ether, which he recognized as a smell commonly associated with the manufacture of methamphetamine. The officer thought he then heard movement inside the house, possibly of people running or hiding. The officer was in contact with another officer, who had conducted surveillance of the residence after receiving information that there was possibly a methamphetamine laboratory at the location. *Id.* at 334. Another deputy at the scene reported having seen a pitcher of white powder, which looked to be either methamphetamine or methamphetamine by-products. *Id*. at 335. The Fort Worth court found these facts amounted to probable cause to support a warrantless entry. *Id*.; *see also Effler v. State*, 115 S.W.3d 696, 698–700 (Tex. App.—Eastland 2003, pet. ref'd) (smell of odor officer associated with manufacture of methamphetamine, in conjunction with officer's knowledge and experience; sound of people running inside house; and one person's opening door then quickly

---

[10]Ammonia, as noted by the Waco court, is a legal substance.

15

running away amounted to probable cause to search). The officers in *Pair* entered to assure that no evidence was being destroyed and no one was injured in the house; they, however, made no search of the premises until they acquired a search warrant. *Pair*, 184 S.W.3d at 333.

The facts present in the instant case are somewhat less than those in the cases cited above.[11] Here, the searching officer had received a tip that on the present record, was basically anonymous with no indication of reliability, though the tipster had claimed to have, at some point in time, assisted in delivering some unidentified "precursors" to the suspected location. A tip by an unnamed informant of undisclosed reliability will rarely, when standing alone, establish the requisite level of suspicion necessary to justify an investigative detention. *See Alabama v. White*, 496 U.S. 325, 329 (1990). There must be some further indicia of reliability, some additional facts from which a police officer may reasonably conclude that the tip is reliable and a detention is justified. *See id.* The informant's veracity, reliability, and basis of knowledge are highly relevant. *State v. Adkins*, 829 S.W.2d 900, 901 (Tex. App.—Fort Worth 1992, pet. ref'd). "Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *White*, 496 U.S. at 330. Proctor testified that he smelled a strong odor of ammonia coming from the suspected residence and that he had experience and training through which he knew ammonia is often used in the manufacture of methamphetamine. After the informant's tip, Proctor stated

---

[11]The State has declined to address the merits of either of Burton's points of error. We find this appellate strategy, trusting all its eggs of judgment and sentence on two felonies, in the basket of a potentially ineffective procedural defense, questionable.

his "intention was to go down there and see if I could observe anything in that area."[12] He went "down there" with "four units."[13] Although the State has not briefed this issue, it appears that their argument would have to be that the smell of ammonia tipped the scale of facts known to Proctor to the side of probable cause. We defer to the trial court on matters of the credibility of the witness at the suppression hearing, and review the finding of probable cause de novo.

The police here only achieved minimal corroboration of the unnamed informant's statement to Proctor. Reviewed in the light most favorable to the trial court's ruling, Officer Proctor's smelling a strong odor of ammonia, combined with his experience that ammonia is often present in the manufacture of methamphetamine, arguably provides some corroboration of the informant's statement that he had helped deliver unspecified precursors to the residence at some point in time. Corroboration by the law enforcement officer of any information related by the informant may increase the reliability of the information. *State v. Stolte*, 991 S.W.2d 336, 341 (Tex. App.—Fort Worth 1999, no pet.).

Had Proctor composed an affidavit describing his observances and submitted them to a neutral magistrate, it is questionable whether he would have obtained a search warrant based solely

---

[12]This statement was made under cross-examination by Burton's attorney. When counsel asked what actions he took to get a search warrant, Proctor replied, "I did not attempt to get a search warrant . . . at that time because I had no probable cause at that point. And with the exigent circumstances, if you've got a lab going, the majority of the time, you don't have time to get a search warrant." Defense counsel's objection that this answer was nonresponsive was sustained, so we will not rely on Proctor's opinion as to whether he had probable cause at that point in our analysis.

[13]Which we take to mean at least four other officers.

17

on the information he had.[14]   In *Davis v. State*, 144 S.W.3d 192 (Tex. App.—Fort Worth 2004, pet. ref'd), the officer's affidavit supporting the search warrant was found inadequate to establish probable cause.   The officer's affidavit relied almost entirely on a confidential informant who had never before provided information to police.   The only evidence of reliability for the informant was that he had been arrested six years previously for an undisclosed drug offense and was supposedly familiar with the "packaging and characteristics" of marihuana.   *Id.* at 198 (affidavit alleged Davis possessed and was growing marihuana).   The court of appeals also found fault with: the officer's verification of the informant's information, which failed to establish that the suspected individuals (named Davis and identified by the officer through driver's license and automobile registration data) were the same Davises to whom the informant referred, which suffered from a lack of specificity in the delineation of criminal activity, which was not independently corroborated or verified, and which lacked any information in the affidavit pertaining to the means by which the informant became privy to the information he provided.   *Id.* at 199–200.

By way of some contrast, an officer's opinion that he smelled an odor he associated with the production of methamphetamine was instrumental in a probable cause determination in *Davis v. State*, 202 S.W.3d 149 (Tex. Crim. App. 2006) (unrelated to above-cited *Davis* from the Fort Worth Court of Appeals).   In *Davis*, officers secured a search warrant.   The Texas Court of

---

[14]Probable-cause determinations in warrantless search situations are made using the same standard as in warrant cases. *Dixon*, 206 S.W.3d at 616 n.6.

Criminal Appeals agreed with the State's concession that the background information in the affidavit was insufficient. That background data consisted of: (1) information procured from a confidential informant (whose history or reliability remained unestablished) that Davis was making methamphetamine at the named location; (2) a Crime Stoppers tip had been received reporting a chemical odor at the residence and Davis was manufacturing methamphetamine at the residence; and (3) information (from an undisclosed source) that Davis had purchased items such as starter fluid and coffee filters, used in the production of methamphetamine. *Id.* at 152. However, the affidavit also included a report from another police officer which stated that on a date and time certain, he drove by the suspected location and "could smell a strong chemical odor he has associated with the manufacture of methamphetamine emitting from the residence." *Id.* at 153.

The court of appeals had reversed the conviction, citing the affidavit's failure to "adequately specify the basis" for the belief of the officer who had detected the odor that the odor he smelled was associated with the production of methamphetamine. *Id.* at 155. The Texas Court of Criminal Appeals, though, found it was not "unreasonable to infer that when a person identifies a smell by association, he has encountered that odor-causing agent before." *Davis*, 202 S.W.3d at 157. Thus, the Texas Court of Criminal Appeals found the trial court properly deferred to the magistrate who made the probable cause determination and issued the warrant, and the trial court did not err in denying the motion to suppress.

Although *Davis* involved a warrant, as we have cited above, the probable cause determination for a warrantless search is virtually the same as that employed in reviewing a warrant. Also of note to Burton's appeal is the following language in *Davis*:

> The affiant in this case, properly relying on facts supplied by another officer, asserted that on the day the affidavit was prepared, an officer drove past the residence, identified it by address, and smelled an odor that he has associated with the manufacture of methamphetamine. <u>On these facts alone, without any other information, the magistrate was authorized to issue the warrant as long as the officer was "qualified to recognize the odor."</u> That is the only relevant inquiry.

*Id.* at 156 (footnote omitted) (emphasis added). The Texas Court of Criminal Appeals, as discussed above, went on to find that the officer detecting the smell was, indeed, qualified to recognize the odor, or at least that was a not unreasonable inference to draw.[15]

Viewing the record in the light most favorable to the trial court's ruling, we cannot say that the trial court abused its discretion in finding probable cause for the search. Whether this Court would have reached the same conclusion is immaterial. The trial court was within its discretion to find that in the totality of the circumstances, there was evidence from which a reasonable officer could conclude there existed a fair probability of finding evidence of a crime at the location at issue.

**Exigent Circumstances**

---

[15]The Texas Court of Criminal Appeals did, though, go on to comment that the affidavit in *Davis* was "far from exemplary" and should not have been dependent on so many "inferences and 'common sense' conclusions." *Davis*, 202 S.W.3d at 157.

Having found the State demonstrated the officers had probable cause to believe evidence of criminal activities were to be found in the residence, the record still must support a finding that exigent circumstances existed which justified a warrantless entrance onto the property. Exigent circumstances justifying a warrantless entry include: (1) rendering aid or assistance to persons whom the officers reasonably believe are in need of assistance; (2) preventing destruction of evidence or contraband; and (3) protecting the officers from persons whom they reasonably believe to be present and dangerous. *McNairy*, 835 S.W.2d at 107 (situations creating exigent circumstances sufficient to justify a warrantless entry "usually include factors pointing to some danger to the officer or victims, an increased likelihood of apprehending a suspect, or the possible destruction of evidence"). Relevant factors include: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) a reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behaviors of persons engaged in the narcotics traffic. *Id.* at 107 (citing *United States v. Rubin*, 474 F.2d 262, 268 (3rd Cir. 1973)).

We alluded to some exigent circumstance caselaw in our analysis of probable cause. In *McNairy*, officers heard people running out of the trailer as officers approached. In *Pair*, officers

21

thought they heard sounds of people moving about inside the house. In *Effler*, police heard people moving around in the house, and the person who opened the door ran quickly away. These facts entered into the respective courts' consideration of whether exigent circumstances justified warrantless entries. In each case, officers' concerns over the possibility of destruction of evidence or for officer safety amounted to exigent circumstances.

Here, however, there was no indication that Burton or the person found in the yard of Burton's house were aware that officers were present until they appeared; there was no evidence of people moving around as if to destroy evidence. As pertains to safety of the officers, Proctor's concern was for some possible "fires or explosions, things like that." But we find the record insufficient to justify his warrantless entry under the facts of this case.

We find it appropriate to discuss the exigencies needed to excuse a failure to knock and announce the execution of a search warrant because the cases establishing or applying the rules on these (*Wilson*, *Richards*, *Ballard*) speak in terms of concerns for safety of the officers involved or about the possible destruction of evidence, the same concerns described in *McNairy* and its treatment of exigent circumstance situations. The United States Supreme Court, in *Richards*, held that in order to "justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). We will use that

22

reasonable suspicion, in conjunction with the factors suggested in *McNairy*, to evaluate the reasonableness of the officers' actions in the instant case.

In *Ballard v. State*, 104 S.W.3d 372 (Tex. App.—Beaumont 2003, pet. ref'd), the appellate court reviewed the officers' decision to dispense with the requirement to knock and announce their intentions to execute a search warrant.[16] The officers decided to enter the house without the requisite knocking and announcing of their presence based on the history of clandestine laboratories being maintained and defended by violent, paranoid persons. *Id.* at 376–78. The appellate court found the officer's testimony to be general and lacking in facts specific to the house and the circumstances involved at the time of executing the warrant. *Id.* at 378–79 (citing *Richards*, 520 U.S. at 394). The court of appeals also pointed out the lack of specificity of the informant's testimony about the possibility that Ballard may have had a weapon and found the officer's reliance on this information misplaced. *Id.* at 383. The court found the State failed to carry its burden of providing adequate evidence to justify its no-knock entrance into Ballard's house.

Proctor testified he believed, once he smelled the strong odor of ammonia coming from the direction of the suspect location, he was confronted with "a hazardous situation. You've got open flames. Too much of it in one location you can cause fires or explosions, things like that." He did not explain what open flames he witnessed before he had already entered the house; later, when describing how he went into the house, he just said he put out "open flames" in the house.

---

[16]*See Richards*, 520 U.S. 385; *Wilson v. Arkansas*, 514 U.S. 927 (1995).

Proctor's stated basis for "exigent circumstances" was that he feared an explosion or fire could occur, but his testimony to support that conclusion appears inconsistent. He first said that open flames were present: "You've got open flames. Too much of it [by which we presume he meant ammonia] in one location, you can cause fires or explosions, things like that." There is no explanation of what "open flames" were present when Proctor first came upon the residence. There is nothing to support an inference that he saw an open flame from outside the house.

Regarding *McNairy*'s factors[17] to consider in reviewing law enforcement's claim of exigent circumstances, we observe that Proctor offered no testimony regarding the length of time he expected it would take him to secure a search warrant. He did say he had contact numbers available to him for appropriate judges and it appears from the record that he discovered the odor of ammonia shortly before midnight. There is nothing in the record to imply a reasonable belief the contraband was about to be removed. Likewise, there is nothing indicating that Burton or anyone else associated with the production of methamphetamine at the residence was aware that they were the target of a police investigation.[18] As for the possibility of danger to law

___

[17](1) degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband. *McNairy*, 835 S.W.2d at 107.

[18]It is true Proctor said that if the suspected illicit chemists had been aware of the officers' presence, they would have begun destroying evidence, but there is nothing in the record to suggest Burton or his partner knew law enforcement agents were present. Proctor said he had his headlights on, but there is nothing in the record describing how close to the residence he or the other officers drove or the layout of the neighborhood, other than Proctor's statements that twenty to twenty-five houses were on this street; and after one neighboring house, the next closest residence was about 200 yards away.

enforcement officers guarding the site if a search warrant were to be sought, Proctor's statement that the possibility of an explosion or fire conceivably augur in support of this factor. Regarding the factor of "the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic,"[19] the only evidence in support of this was Proctor's statement that the suspects would have begun destroying evidence if made aware of the officers' presence. Proctor also said methamphetamine itself—not the elements and implements used to manufacture it—could easily be destroyed. Proctor offered no testimony as to how quickly other items could be destroyed. For example, there were amounts of fertilizer being soaked or boiled, a Coleman lantern, and other (presumably smaller) items such as rock salt and pseudoephedrine.[20] Considering the evidence with *McNairy*'s suggested factors, we find there was evidence of some degree of urgency (first factor) and of some danger to the officers and others in the immediate vicinity (third factor); but little or no evidence, other than Proctor's broad assertion that evidence could be destroyed, that evidence could soon be removed or destroyed, or that suspects knew that law enforcement officers were close by and investigating (second, fourth, and fifth factors).

A finding of exigent circumstances is a finding of fact which an appellate court reviews only for clear error or an abuse of discretion. *Parker*, 206 S.W.3d at 598 n.21 (citing *United*

---

[19]*Id.*
[20]During the hearing, references were made to pictures taken at the scene and a report detailing seized items, but these were not part of the appellate record. Proctor also referred to a "generator," but it is not clear if he meant a gasoline-run machine to generate electricity or something else.

*States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006)).   As stated above, Proctor's testimony was not entirely clear as to whether he saw evidence of the methamphetamine laboratory on his first entrance into the house, when he "cleared" it, or on the second, when he returned with a breathing apparatus.   In *McNairy* and *Pair*, discussed above, although officers initially entered the premises under exigent circumstances, they did not search the buildings until after they had secured a search warrant.

Proctor's testimony did not amount to a reasonable suspicion that entrance without securing a warrant was necessary either for the safety of the officers or the public, or to prevent the destruction of evidence.   Finding there was insufficient facts to support law enforcement's "exigent circumstance" entry into Burton's residence, we sustain the second point of error.

**Harm Analysis**

Because we have found the warrantless search was not authorized by an appropriate exception to the requirement of a warrant, the error here is constitutional.   We must reverse the conviction unless we conclude beyond a reasonable doubt that the error made no contribution to Burton's conviction or the punishment.   TEX. R. APP. P. 44.2(a). In the instant case, the complained-of evidence which Burton sought to suppress includes both the methamphetamine with which Burton was charged to have possessed in this case and the chemicals he was charged with possessing in the companion case.   A search that offends the Fourth Amendment renders the subsequently discovered evidence inadmissible as a "fruit of the poisonous tree."   *Segura v.*

26

*United States*, 468 U.S. 796, 804 (1984); *see also Hernandez v. State*, 60 S.W.3d 106 (Tex. Crim. App. 2001) (error resulting from admission of evidence in violation of Fourth Amendment to be reviewed under Rule 44.2(a)). The evidence should have been suppressed; as such, the error contributed to Burton's conviction. *See McQuarters v. State*, 58 S.W.3d 250, 258 (Tex. App.—Fort Worth 2001, pet. ref'd); *Corea v. State*, 52 S.W.3d 311, 317–18 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd).

We reverse the judgment and remand to the trial court for further proceedings.

Bailey C. Moseley
Justice

Date Submitted:    March 15, 2011
Date Decided:    April 5, 2011

Publish